**PIAGGIO & C., Plaintiff-Appellee and Appellant,**

v.

**CUSHMAN MOTOR WORKS, INC., and Outboard Marine Corporation, Defendants-Appellants and Appellees.**

No. 16927–8.

United States Court of Appeals Seventh Circuit.

Oct. 6, 1969.

Rehearing Denied Nov. 13, 1969.

Richard James Stevens, Edwin H. Conger, Irwin J. Askow, Chicago, Ill., for Piaggio & C.; Robert S. Groban, New York City, Tenney, Bentley, Guthrie, Askow & Howell, Chicago, Ill., of counsel.

Charles R. Sprowl, Walter C. Clements, Michael D. Aufrecht, Chicago, Ill., for Cushman Motor Works, Inc. and Outboard Marine Corp.; Taylor, Miller, Magner, Sprowl & Hutchings, Chicago, Ill., of counsel.

Before FAIRCHILD and CUMMINGS, Circuit Judges, and HOLDER, District Judge.[1]

FAIRCHILD, Circuit Judge.

Action for breach of contract.[2] Plaintiff Piaggio manufactures Vespa motor scooters in Italy. Defendant Cushman formerly manufactured motor scooters at Lincoln, Nebraska, and, for a time, sold Vespa scooters made by Piaggio. Cushman has now been liquidated into defendant Outboard.

[1] District Judge Holder of the Southern District of Indiana is sitting by designation.

[2] Jurisdiction is founded on diversity. The parties have treated Illinois law as controlling substantive issues other than those under the antitrust laws of the United States.

In November, 1960, Piaggio and Cushman made a contract, effective January 1, 1961. In it Piaggio appointed Cushman a nonexclusive distributor in the United States for the Vespa line. Cushman agreed to purchase quotas of scooters in specified periods. Outboard guaranteed performance. The contract would expire at the close of 1966, but had provisions permitting earlier cancellation by Cushman. Because of competition by Japanese manufacturers, sales of Vespas fell far below expectations. Cushman exercised its option to cancel at the earliest opportunity and gave appropriate notice in January, 1962, effective January 31, 1963.

The quota requirements left in force were: (1) that during 1961 and 1962, combined, Cushman must purchase not less than $3,000,000 of scooters, spare parts, service repair equipment, and accessories, subject to various provisions allowing credits against the quota, and (2) that during the month of January, 1963, Cushman must buy 583 scooters. This figure results from proration, pursuant to the contract, of the 1963 quota of 7,000 scooters.

During most of 1962 the parties jockeyed for position, squaring off at arm's length, or, one could better say, at spear's length. Cushman knew that after purchasing its quota it would have a supply of scooters which it would be unable to sell until well into 1963 or beyond. Some change in model was anticipated, and Cushman wanted to get 1963 models so that it could offer the same models as other American distributors of Vespa would be offering. Piaggio intended to and ultimately did export the 1963 models to the United States beginning in February 1963 and evidently did not want to supply them to Cushman. Piaggio's other American distributors were going to remain in the picture, and they had previously complained to Piaggio about competition from Cushman.

Cushman failed by a substantial margin to purchase its quota, claiming breach and repudiation by Piaggio, and in March, 1963 Piaggio brought this action to recover the profits it would have made on the scooters which Cushman failed to buy.

Cushman asserted several defenses, including the breach and repudiation referred to. Cushman counterclaimed for the profits it would have made on the scooters it was prevented from buying and for Piaggio's refusal to refund the price of unsold spare parts and the like, as required by the contract. Cushman also sought treble recovery on a count charging that Piaggio combined with the other American distributors to prevent Cushman from competing with them, in violation of the antitrust laws.

The case was tried without a jury. The district judge filed findings and conclusions resolving the various issues. The net result was recovery by Piaggio of $44,952.62, for which judgment was entered. Both sides appealed.

1. *The 90 day "lead time" problem.* One difficult question is whether, for the purpose of fulfillment of quota, a purchase is counted as of the date the order is placed or the date the goods are to be shipped. In ¶ 9 Cushman agreed, "that we shall submit our orders for scooters or spare parts 90 days prior to the first day of the month during which we desire you to ship such scooters or spare parts."

If a purchase is to be counted against quota as of the date it is to be shipped, then it follows that the latest date on which Cushman could, as a matter of right, place an order which could fulfull the 1961–62 quota would be 90 days before December 1, 1962, or September 2, and the latest date for the January, 1963 quota would be October 3.

On the other hand if a purchase is credited against quota when the order is placed, Cushman could properly have waited until late December to place sufficient orders to fulfill the 1961–62 quota. This was important because the order could have been placed in December for shipment in April, and Cushman's insistence upon being supplied

with 1963 models would seem reasonable. The question is also important because during October Piaggio took the position that Cushman had breached the contract by failing to place orders for the quota and Cushman took the position that Piaggio's statement was, in effect, an indication that it would no longer sell if an order were placed, and that Piaggio's subsequent failure to provide an assurance of due performance upon Cushman's demand amounted to a repudiation. If purchases are counted as of the date the goods are to be shipped, then Cushman had broken the contract before Piaggio's statement in October. If they are to be counted as of the date the order is placed, then Cushman could still have complied with the quota provisions and its position with respect to assurance of due performance might have merit.

The contract is in the form of a letter from Cushman to Piaggio, accepted by Piaggio. The parties stipulated, however, that the attorneys for both Piaggio and Cushman took part in drafting it. We are not in a position to construe it unfavorably to either party on the basis of that party being the draftsman.

The quota obligation for 1961 and 1962 is in ¶ 6, and is phrased "During the first two calendar years of this agreement, we commit ourselves to purchase from you not less than $3,000,000. * * *" ¶ 7 provides the quotas for each subsequent year. It is phrased, "During the succeeding years of the contract, we agree to buy the following quota of scooters. * * *" Neither "purchase" nor "buy" is defined in the contract. It is clear that an order is to be a firm commitment, for ¶ 11 provides that every order shall be accompanied by an irrevocable letter of credit, payable in American dollars against shipping documents in the amount of the order and confirmed through an Italian bank.

Two provisions of ¶ 6 arguably suggest, though they are not conclusive, that fulfillment of quota depends upon when the order is placed. After subpar.

(A) provides for crediting certain purchases from a former distributor against the purchase commitment, subpar. (B) provides: "As to the balance of the purchase commitment, not less than one third of the remaining purchase commitment shall be ordered in either of the first two years of this agreement;" and subpar. (C) provides: "Such orders shall consist of at least 80% in dollar volume of scooters and accessories and the balance may be in spare parts or service tools."

Piaggio took the position in a letter dated May 17, 1962 that the balance of the 1961 and 1962 commitment would have to be ordered by August 31, "90 days prior to December 1st." Referring to the scooters to be bought in January, it said the latest date for ordering would be September 30.

Cushman does not appear ever to have expressly contradicted the assertion that orders must be placed by August 31 or September 30. It went to considerable effort to obtain information in July and August as to the prefix symbols Piaggio would use on the 1963 models and apparently intended to use these in placing orders in August for delivery at the close of the year.

In a letter September 26, 1962 discussing the effort to obtain 1963 models, a Cushman representative refers to the "90 day lead time for ordering" in a context which suggests that orders would have to be placed in September for the final deliveries under the contract.

Piaggio wrote to Cushman October 23, 1962, and stated that Cushman had breached the contract by its failure to place its order for the remaining units by October 1, 1962, "the last date permitted by the Cushman-Piaggio contract."

 Although there is certainly room for argument, it seems to us that the more reasonable interpretation is that, for the purpose of fulfillment of quota, a purchase is counted as of the date the goods are to be shipped. The date of shipment is close to the time the goods

become part of the stock of the distributor as well as the time the manufacturer completes production. It seems reasonable that these times should fall within the quota period. And it is doubtful that the parties to a distributorship contract would intend that one who is about to cease being a distributor for the manufacturer would be required or permitted to order a large stock of goods for delivery three months after he is no longer a distributor.

■ Accordingly we conclude that Piaggio correctly asserted on October 23 that there had been a breach, and that such assertion, and the failure to modify it on demand, did not amount to a repudiation by Piaggio.

2. *Piaggio's refusal to supply the so-called 1963 models.* Cushman claimed that during discussions in May, 1962, Piaggio had agreed to supply 1963 models in the last deliveries under the contract. Piaggio denied the claim. The district court excluded the offered testimony on the ground it would show only an oral modification of the written contract.

Cushman decided that the way to ensure receiving 1963 models would be to discover the prefix symbols Piaggio would use on them and specify the prefix in its orders placed in August or September, 1962. Then when shipment was made, the shipping documents would have to contain serial numbers with the same prefix in order for Piaggio to obtain funds under the letters of credit. Piaggio supplied the prefix for the 1963 model of the G.S., or Grand Sport, the most expensive of the three scooters, but avoided supplying the prefixes for the 125 and 150 cc scooters, the more salable ones.

The district court found that Piaggio did not act in good faith in refusing this information. The real question, however, is whether Cushman had any right to have 1963 models shipped to it in December, 1962 and January 1963. If Cushman had no right, refusal to supply the prefix was not in bad faith. The contract said nothing about any change

in models. It is clear that there was no regular practice of change at a specified time of year, similar to the practice in the American automobile industry.

Three types of scooters were involved under the contract: 125 cc (price to Cushman $174); 150 cc (price to Cushman $199); and G.S. (price to Cushman $234). A change in production was made in the 125 cc and the 150 cc scooter at the factory in November, 1962. The change was relatively insubstantial, although the scooters which incorporated it were considered a new model. Scooters of the new model were first available for sale in Italy and the rest of Europe in January, 1963. They were first available for sale in the United States in February. A change was made in the G.S. in January, 1963. The new models were first available for sale in Italy in January, in the rest of Europe in April, and in the United States in February.

■ We think it clear that Cushman would be entitled to buy for delivery in December and January the models which were made available to other United States distributors in those months. But the new models were not made available to anyone in the United States. We understand the desirability, in terms of Cushman's business interest, that it have a stock of current models later on when other American distributors had them. Cushman naturally hoped that Piaggio would be willing to supply 1963 models in fulfillment of the quotas, but we are unable to discover that Cushman had a contract right to fulfillment of its hope. No claim is made that the timing of the model change or of its release to the market was devised in bad faith.

The district judge did not prepare a memorandum. It appears from his findings and conclusions that in deciding that Piaggio was entitled to recovery his analysis was somewhat different from ours. We agree, however, that Piaggio is entitled to a recovery based on the failure of Cushman to fulfill its quota, and that Cushman is not entitled to recovery on the theory that Piaggio

wrongfully prevented Cushman from purchasing items on which profits could have been made. The district judge rejected Piaggio's claim for profits on the 583 scooters constituting the January, 1963 quota. We conclude, however, that when the judgment is recomputed, Piaggio will be entitled to recovery on these as well.

A number of other problems, most of them related to credits allowable against quota, remain.

3. *Cushman's special interpretation of the 1961–62 commitment.* Subpar. (A) of ¶ 6 of the contract gave Cushman a credit against its $3,000,000 1961–62 commitment for any items Cushman purchased from a former Vespa distributor. Fortunately everyone agrees that the appropriate credit figure is $339,768.78, leaving a balance of $2,660,231.22.

Cushman advances an ingenious interpretation of the contract according to which, using the credits it claims, it more than fulfilled the balance of its 1961–62 quota.

We have already quoted subpars. (B) and (C) of ¶ 6. Cushman argues that because of (C) it really had two quotas, one for scooters and one for spare parts and the like. The scooter quota (a minimum) would be $2,128,184.98, 80% of the balance remaining after applying subpar. (A) The parts quota (a maximum) would be $532,046.24, 20% of such balance.

Cushman points to ¶ 16, providing that in the event of early termination (which occurred) Piaggio must refund the purchase price of unsold spare parts, accessories or service tools which Cushman had on hand at the date of termination. Cushman says that the parts quota may be disregarded for the purposes of this action because it could have purchased $532,046.24 worth of spare parts and turned them back for refund.

By starting from a commitment to buy $2,128,184.98 in scooters and considering only purchases of scooters and other credits claimed, Cushman computes that it has more than fulfilled its obligation.

The analysis can not be sustained. The contract does not create separate quotas in two separate categories. As we read subpar. (C) any order must be for at least 80% in scooters. Many orders were presumably for a greater precentage, up to 100%, but when Cushman placed an order for scooters only, it did not acquire the right to place a later order for more than 20% parts.

It is theoretically possible that every order would be for exactly 80% scooters and 20% parts; that there would be exact fulfillment of the quota; that an early termination would occur with most of the parts unsold; and that Piaggio would be required to refund most of the money paid for parts, so that, in substance, the effective quota turned out to have been 80%, taken in scooters. But the possibility that it might have happened that way does not support a strained construction of the contract which reduces the 1961–62 quota to 80%, taken in scooters.

4. *Credits for sales to others.* Piaggio had three other distributors in the United States, with exclusive rights in particular territory, and with nonexclusive rights in other territory. Subpar. (D) of ¶ 6 provided for credit against Cushman's 1961–62 commitment for all sales made by Piaggio in an area where Cushman was not permitted to sell and for 50% of sales made by others in an area where Cushman was permitted to sell. There was an overriding limit of $750,000 on such credits.

¶ 21 provided: "In the event you shall, subsequent to January 1, 1961, appoint any new distributors or expand the existing territory of any existing distributor beyond his present territory to sell scooters * * *, our purchase commitments and quotas set forth in this agreement shall be reduced by the number of vehicles or dollar sales of vehicles purchased by such distributors, and the

$750,000 limitation on the reduction of our commitment or quota shall not apply."

The three other distributors were: Crain-Hillis Italian Motor Company, Vescony, Inc., and Western Scooter Distributors.

(a) *Crain-Hillis*. The district court allowed a credit of $71,919.55 for sales of scooters by Crain-Hillis. Apparently the correct figure, including sales of parts etc. is $84,119.35.

(b) *Vescony*. The district court allowed Cushman full credit, pursuant to ¶ 21, for all scooters purchased by Vescony in 1961–62. It found that Piaggio had increased Vescony's territory twice, in January, 1961 and in May, 1962.

■ If ¶ 21 be read literally, all sales of scooters to a distributor whose territory is expanded are to apply as credits against quota, whether the sales were before or after expansion. The district court seems to have followed such reading, and Piaggio has not argued to the contrary. On that basis, the credit for all Vescony scooter sales is proper if either expansion took place.

■ Piaggio contends that ¶ 21 does not apply to the first expansion because Piaggio and Vescony agreed on the expanded territory in late December, 1960 and the letter confirming it was dated December 29. It is clear that the new territory represented an expansion over "present territory" as of November 18, 1960, the date of the Cushman contract. The letter fixed a quota "from January 1, 1961 through December 31, 1961," and presumably related to the calendar year, 1961. Literally ¶ 21 omitted dealing with an expansion of another distributor's territory effected after the Cushman contract was signed but on or before January 1, 1961. No reason is suggested why the parties would intend Piaggio to be free to appoint new distributors or expand territories without penalty during those few weeks. On two occasions in 1962, the managing director of Piaggio, in letters to Cushman, referred to the Vescony expansion as if ¶ 21 applied. Al-

though he testified at trial that he made a mistake in so referring to the expansion in question, we think his testimony could be deemed an afterthought and that the letters justified following the reasonable rather than the literal meaning of ¶ 21.

Piaggio argues that the information on which the district court relied in finding an expansion in May, 1962 was not competent evidence. It becomes unnecessary to consider the point. The credit for Vescony purchases is $881,600.40.

(c) *Western*. Piaggio sent a letter to Western dated October 24, 1962 appointing it distributor for a larger territory.

■ Piaggio contends that because breach by Cushman had already occurred it should not be allowed credit for an expansion on that date. Assuming this contention would be correct if the expansion did not occur until then, the district court found that Western's territory was expanded July 1, 1962.

It appears that there had been discussions between representatives of Piaggio and Western earlier in 1962 about expanding Western's territory. On July 5 Western wrote to Piaggio asserting that an agreement had been reached with Piaggio's representative in the United States, and asking for the new contract and separate letters of appointment for the various states. The letter contract covering the enlarged territory was dated October 24, but stated that it was effective "as of July 1, 1962." This suggests that it gave evidence in writing of an oral agreement reached earlier. Piaggio explained that dating the appointment back to July was only a means of adjusting quota, but we think that in the light of the other evidence, the court's finding was not clearly erroneous. The credit for sales to Western was $279,-512.62.

5. *Amount by which Cushman failed to fulfil its quota*. We state herein a computation of the deficiency in fulfilment of the 1961–62 quota, using figures which, as far as we can ascertain, are factually consistent with the reasoning

we adopt in this decision. If it can be demonstrated that they are not, the district court is free to correct them upon remand.

| | | |
|---|---|---|
| 1961–62 commitment (¶6) | | $3,000,000.00 |
| Credits per contract: | | |
| Subpar. (A) | $339,768.78 | |
| Subpar. (D) (Crain-Hillis) | 84,119.35 | |
| ¶21, Vescony | 881,600.40 | |
| ¶21, Western | 279,512.62 | |
| | | 1,585,001.15 |
| Net for which Cushman was responsible | | 1,414,998.85 |
| Purchases by Cushman | | 1,026,873.86 |
| | Deficiency: $ | 388,124.99 |

In addition the 1963 quota was 583 scooters. Cushman purchased none, and the parties have not argued here whether there was any credit against this quota.

6. *Damages.* The findings of the district court contained the following: "Piaggio introduced evidence to show its net profit percentages per unit in the manufacture and sale of various models to be as follows:

| | |
|---|---|
| 125 cc | 26.7% |
| 150 cc | 34% |
| G.S. | 25% |

The proof left much to be desired with respect to overhead cost apportionment. However, there is no other proof of costs or comparative standards before the court. Under the contract, the defendant Cushman could have completed its commitment by making all of its orders for the model upon which Piaggio shows the lowest percentage of profits, namely the G.S. on which Plaintiff's proof shows a profit of 25%."

The court selected 25% for computation of damages. Piaggio seeks more because it was improbable that Cushman would have purchased the G.S. and Piaggio made more profit on the other types.

▇ It is true that if Cushman had been promised 1963 models it intended to order 125 cc and 150 cc scooters in a ratio of 1 to 2. But it preferred to run the risk of paying damages to ordering any 1962 scooters. Arguably, at least, it might have ordered 20% of the remaining commitment in spare parts, and turned them in for full refund. In the light of all the circumstances, and the inherent uncertainties in fixing damages, we can not say that the use of 25% is unreasonable. Therefore, on remand, damages for failure to fulfil the 1961–62 commitment are to be computed at 25% of the amount of Cushman's deficiency.

It will also be necessary to fix a fair figure for lost profits by reason of Cushman's failure to fulfil its January, 1963 quota, but this issue has not been argued here.

▇ 7. *Interest.* The district court refused to include interest from the date of default to the date of judgment. He deemed the amount of damages unliquidated.

*Piaggio* relies on L. W. Foster Sportswear Co. v. Goldblatt Bros., Inc.[3] as authority that it is entitled to interest under the law of Illinois. In *Foster,* however, the damages were ascertainable by computing the difference between the contract price of goods and their market price.[4] Damages in the case before us

3. (7th Cir., 1966), 356 F.2d 906, 910.

4. See Sterling-Midland Coal Company v. Great Lakes Coal and Coke Company,

266 Ill.App. 46, 57, cited in National Dairymen Ass'n. v. Dean Milk Co. (7th Cir., 1950), 183 F.2d 349, 355.

were not readily ascertainable by such means, and the district court was correct in refusing to allow interest to date of judgment.[5]

**8. Credit for unsold spare parts.** As already noted, ¶ 16 required Piaggio, in the event of early termination, to refund the price of unsold spare parts and related items. On January 31, 1963, Cushman had on hand items of that sort, with a cost of $99,093.58. Cushman distributors had additional items, for which Cushman gave them a credit of $9,610.30. Cushman did not, on or after January 31, tender these items to Piaggio nor make demand for refund. In April it realized $24,000 by sale of the items to Western.

Cushman claims recovery of the net of $84,703.88. The district court decided in favor of Cushman, although it offset the amount against the 1961–62 purchase commitment rather than against the computed damages for failure to fulfil it.

Piaggio essentially took the position in December, 1962, and now, that Cushman's material breach of its purchase commitment discharged Piaggio's duty to take back and refund the price of unsold parts. There is some question on the point since the promise to refund seems directly related to Cushman's promise to service and supply parts for Vespas already sold, and to protect Cushman from risk in maintaining an adequate supply.[6]

Cushman had made what it called a tender of the parts November 21, 1962, probably on the theory that the contract had been terminated by then by Piaggio's breach. The tender was premature. The district court found that further tender was made unnecessary by a statement made by Piaggio's representative to two Cushman people December 12 that Piaggio was not going to repurchase the inventory. It appeared that the same conversation included a proposal of settlement in which the return of the spare parts figured. As it turns out, Cushman would not have been entitled to a refund of money, but at most to offset the price of the parts against damages due Piaggio, had the parts been restored to Piaggio.

We think that under the circumstances and in its context, the December 12 statement referred to is not to be given the legal effect of relieving Cushman from making a timely and appropriate tender, even if Piaggio's obligation to refund survived Cushman's breach.

**9. The antitrust claim.** Cushman alleged that Piaggio, Western, and Vescony conspired to prevent competition by Cushman after April, 1962, and that Piaggio's refusal to furnish 1963 models and to accept orders after September 30 were acts in furtherance of the conspiracy.

The district court found that Piaggio had once suggested that all the distributors, including Cushman, make a price fixing agreement; that Cushman declined; that the others complained of price reductions by Cushman. The court recited several facts which he said raised a strong suspicion that a price fixing attempt was made and that Piaggio was anxious that it should come about. The court found, however, that the evidence failed to show actual price fixing and failed to prove the antitrust count. The findings were not clearly erroneous.

The judgment appealed from is vacated and the cause is remanded for a new computation of the amount to be recovered by Piaggio, consistent with this opinion, and entry of judgment therefor. The district court is free to hear further evidence if necessary to complete such computation. Plaintiff is deemed the prevailing party on this appeal and is awarded its costs in this court. It should also be allowed costs in the judgment of the district court.

5. Harvey v. Hamilton (1895), 155 Ill. 377, 40 N.E. 592, 594.

6. See Restatement, Contracts § 275 for some of the relevant considerations.