Jeanette Adele **DAVIS**, Appellant,

v.

**STATE** of Alaska, Appellee.

No. 1532.

Supreme Court of Alaska.

Oct. 13, 1972.

Herbert D. Soll, Public Defender, Bruce A. Bookman and Larry A. Jordan, Asst. Public Defenders, Anchorage, for appellant.

John E. Havelock, Atty. Gen., Peter A. Michalski, Asst. Atty. Gen., Juneau, for appellee.

Before RABINOWITZ, C. J. and CONNOR, ERWIN and BOOCHEVER, JJ.

## OPINION

RABINOWITZ, Chief Justice.

Jeanette Davis was convicted of possession of heroin following a trial by jury.[1] In this appeal she presents two specifications of error. Her first assignment of error asserts that the trial court erred in refusing to grant her motion for judgment of acquittal at the close of the state's evidence. She also claims that it was error for the court to allow the prosecution to comment on her failure to tell the state troopers at the time of her arrest the exculpatory story she testified to at trial.

As to the first assertion of error we hold that the trial court correctly denied Davis' motion for judgment of acquittal. In passing on this assertion of error we,

"[M]ust view the evidence and the inferences to be drawn therefrom in a light most favorable to the state." De-

Sacia v. State, 469 P.2d 369, 371 (Alaska 1970) (footnote omitted); Beavers v. State, 492 P.2d 88, 97 (Alaska 1971). Applying this standard to the record in the case at bar, we must determine whether "fair minded men in the exercise of reasonable judgment could differ on the question of whether guilt [had] been established beyond a reasonable doubt." Bush v. State, 397 P.2d 616, 618 (Alaska 1964).[2]

The record on this case shows that on October 5, 1970, Melvin Schroder, a lost and found agent for Western Airlines, arrived at his place of work at Anchorage International Airport. At that time he noticed a brown suitcase in the lost and found office that had not been there the previous day. Schroder testified that he opened the suitcase and observed that it contained three rubber containers, each about the size of a golf ball.[3] Apparently suspecting that drugs were in the containers, Schroder discussed the matter with his supervisor who in turn contacted the state troopers. Schroder kept the suitcase in the lost and found office until the troopers arrived.

State Troopers Ule Bivens and Norman Chafin met Schroder at the lost and found office. Schroder opened the bag and showed the troopers the substance that he suspected to be a narcotic. A field test performed on the substance indicated the presence of heroin. The troopers kept two of the containers and placed the third back in the suitcase.

State Trooper Wesley Taylor testified that he arrived at the Western Airlines lost and found office around noon of October 5. Around 4:00 p. m. that afternoon, Jeanette Davis came into the lost and

---

1. Appellant was convicted of a violation of AS 17.10.010 which provides:

    It is unlawful for any person to manufacture, possess, have under his control, sell, prescribe, administer, dispense, give, barter, supply or distribute in any manner, or compound any narcotic drug except as authorized in this chapter.

2. Condon v. State, 498 P.2d 276, 278 (Alaska 1972). *See also* Trounce v. State, 498 P.2d 106, 110 (Alaska 1972).

3. It is the custom of Western Airlines to open unclaimed luggage to determine ownership, and to prepare a form listing the contents of the bag, the name of the owner if such is apparent, the color of the bag, and the flight and baggage ticket numbers.

found office. She then presented a baggage claim ticket to Western Airlines agent Noel Arline. Arline testified that

> [Davis] stated, "I have a bag here that belongs to me and I want to pick it up," and "here's the baggage claim check." I stepped around the desk, took the baggage claim check and she said, "[H]ere's my bag sitting here."

Jeanette Davis took the suitcase and walked over to the Alaska Airlines baggage claim area[4] and met two men. One of the men took the brown suitcase, went outside the terminal and placed the suitcase in a car. Officer Taylor followed him outside and placed him under arrest. Davis came out of the terminal shortly thereafter and Taylor then arrested her. The three of them then went back into the terminal and waited for Davis' luggage from a recent flight. Eventually they picked up Davis' suitcase and with her consent, Officer Taylor searched that bag as well as her purse. He found no drugs.

■■ To sustain a conviction for possession of narcotics, the prosecution must prove a knowing possession by the accused.[5] The circumstance that Jeanette Davis presented a claim ticket that matched the tag on the suitcase containing heroin tended to show that she had knowing control of the prohibited drug. The prosecution's evidence showed that Davis arrived at Anchorage International Airport the day after the suitcase in question arrived. As has been pointed out, Noel Arline testified that she came into Western's lost and found office, presented the appropriate baggage claim ticket and stated, "I have a bag here that belongs to me and I want to pick it up and here's the baggage claim check". After Western's agent Arline took the baggage claim ticket Davis said "[H]ere's my bag sitting here." Although none of the contents of the suitcase

showed that the suitcase belonged to Davis, neither was there anything to show that it belonged to anyone else. We believe that the jury could reasonably have inferred from the state's evidence that Davis brought the claim ticket for the brown suitcase with her to Anchorage and that she had checked that suitcase herself before departing for Anchorage. We conclude that the prosecution's evidence as to Davis' knowing possession of a narcotic drug was such that "fair minded men in the exercise of reasonable judgment could differ on the question of whether guilt [had] been established beyond a reasonable doubt".[6] We therefore hold that it was not error on the trial court's part to have denied Davis' motion for a judgment of acquittal.

■ In her second specification of error Davis argues that the trial court should not have allowed the prosecutor to comment upon her "failure to speak" at the time of her arrest. More particularly, Davis asserts that the prosecutor's comments, made during his final argument, constitute prejudicial error because "admissions by silence are of little probative value, and when in the face of police accusation, should not be allowed for any purpose." Moreover, Davis claims that she "had the constitutional right to remain silent and the comment by the prosecution violated appellant's Fifth Amendment right under the United States Constitution . . . ." We hold that the record demonstrates that these assertions of error do not warrant the setting aside of Davis' conviction.

The question of what, if anything, Davis said, at the time of her arrest was first injected into the case by her trial counsel. On cross examination Davis' counsel asked Investigator Taylor of the Alaska State Troopers whether Davis said anything at

---

4. Davis was apparently waiting for her baggage from a recent flight.

5. Judd v. State, 482 P.2d 273, 280 (Alaska 1971) ; *see* Egner v. State, 495 P.2d 1272 (Alaska 1972).

6. Bush v. State, 397 P.2d 616, 618 (Alaska 1964).

the time of her arrest. At first Taylor responded that he was sure they talked, but that he didn't recall exactly what the content of their conversation was. Davis' trial counsel then asked "You don't recall her saying something like, "What's this all about?" To this question Taylor replied "Well, I—yeah, she said something, yes, in—in that line, yes, sir."

As part of her defense on direct examination Davis testified that just prior to coming to Anchorage she had been in Portland, Oregon, visiting friends. One of those friends, Cookie Turner, had arranged to fly to Anchorage with her. In preparation for the flight Turner went out to the airport and checked her luggage. At the last moment, Turner was called immediately to California and decided not to go to Anchorage with Davis. Turner gave Davis the claim ticket for the baggage she had previously checked and asked Davis to pick it up for her. A friend of Turner was to stop by Davis' home in Anchorage to get the suitcase.

On redirect examination by her trial counsel, Davis was asked whether she said anything to the police when they arrested her. Davis answered:

Yes, I asked them what was he arresting me for and he said—he—didn't say for possession of narcotics, he said for transporting narcotics and I say he got to be kidding and he said no, I'm not kidding. And so I asked him I said well, where is it, you know, and he says you don't know and I said, no I don't; and he said you have any luggage coming in and I said yes, I have. . . .

On the recross examination by the prosecution, Davis was asked if she had related to Officer Taylor, or any other officer at the time of her arrest, the exculpating Cookie Turner version she had testified to on direct examination. After her trial counsel's objection had been overruled Davis answered:

I don't remember exactly. It seems as I did say something but I just—I remember I said something about you can go to jail for anything these days, all I did was claim somebody's luggage and I have to go to jail for it, and something in that order.

During final argument trial counsel for Davis made the following comments in part to the jury:

I ask you to find and think that in this type of a case where you're being asked to make sure to a moral certainty, that you're not sure in this case, that suspicion and probability are not enough. I mean remember here's—she didn't say as they do in many narcotic cases, you know, you got me or that's all there is or okay, I'll cooperate or it wasn't mine, I was just carrying it for someone, she said, what—what's it all about. I mean that's a spontaneous exclamation at the scene. That's a pretty threatening thing to be just yanked on the arm and say, ["y]ou're under arrest[."] It all points to one thing that the very least reasonable doubt exists, we can guess, we can speculate, but the doubt remains and it's a reasonable doubt.

This brings us to the point in the trial where Davis asserts that the trial court committed reversible error. In response to Davis' counsel's final argument, the prosecution made the following comments to the jury:

What would you do if a narcotics man or a customs man or anyone else stopped you? Wouldn't you tell them immediately no, this is not my bag, this is Cookie Turner's, but maybe it it is not even mine.

.   .   .   .   .   .

What's logical, what would you do if you were caught with somebody else's[?] Wouldn't you tell the people immediately what the story was[?] I'm sure that you would. Wouldn't you tell who was supposed to be picking it up and so forth[?]

.   .   .   .   .   .

She has a right to remain silent and not testify against herself but she has a logical excuse to make that this was all

something wrong; that she was entirely innocent, that she was never involved, that somebody else was sending narcotics, she knew nothing about it. I think you can understand that logically you would tell somebody what the story was, but she didn't tell anybody until here today.[7]

We are disinclined to hold that these comments by the prosecutor require the granting of a new trial. The record shows that in his final argument Davis' trial counsel argued to the jury that they should have a reasonable doubt as to Davis' guilt because at the time of her arrest "she didn't say as they do in many narcotics cases, . . . it wasn't mine [or] I was just carrying it for someone, she said, what . . . what's it all about."[8] Davis' trial counsel emphasized to the jury that her spontaneous exclamation "what's it all about" raised at the very least a reasonable doubt as to the guilt. As we read the record, the portion of the prosecutor's final argument that is now questioned, was made in response to Davis' counsel's contention that the arrest of his client didn't elicit the type of exculpatory response usual in cases of this character. In this factual context it was proper for the prosecution to counter defense counsel's argument and to argue to the jury that a more logical response to the arrest would have been to tell the arresting officers that it was not her suitcase, that the suitcase belonged to Cookie Turner. Since the prosecutor's comments were made in reply to the theory advanced by defense counsel in his final argument, and since the record reflects at least an ambiguity, if not an inconsistency, in what Davis testified she

said at the time of her arrest, we find that the prosecutor's closing remarks "were within the range of reasonable inferences that could be drawn from the evidence and therefore [were] permissible." Gafford v. State, 440 P.2d 405, 414 (Alaska 1968).

▮ Based on our resolution of this issue, we further conclude that Davis waived any constitutional objection to the prosecution's final remarks. The issue of Davis' comment at the time of her arrest was raised by her own counsel. Moreover, in his closing argument, Davis' counsel relied upon possible inferences from her comments made at the time of the arrest. Davis may not then claim a constitutional privilege against the prosecution's reasonable rebuttal in its closing argument on that question.[9]

▮ On the other hand we do consider this an appropriate occasion to voice our disapproval of any comment absent waiver by the prosecution on an accused's silence resulting from the exercise of his constitutional rights. Article I, section 9 of Alaska's constitution provides in part that "No person shall be compelled in any criminal proceeding to be a witness against himself." In another context in Bargas v. State, 489 P.2d 130, 133 (Alaska 1971) we commented that:

> One's assertion of his constitutional right not to submit to a search of his person cannot be used as evidence of guilt if this constitutional right is to have any meaning . . . . It was error to allow Herl to testify as to appellant's refusal to submit to a search.

There is considerable federal precedent to the effect that

---

7. Davis' counsel objected to this portion of the prosecutor's final argument but the trial judge did not rule on the objection. Under these circumstances, we assume that the objection was overruled.

8. At first Davis testified that she asked the arresting officer what's it all about, and then said he's got to be kidding. Later in her testimony on cross examination Davis related that she told the officer "you can go to jail for anything these

days, all I did was claim somebody's luggage and I go to jail for it . . . ."

9. See Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1, 4; McGautha v. California, 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711, 731.

A client is bound by his attorney's decisions made during the course of trial to waive his constitutional rights for strategic or tactical reasons. Lanier v. State, 486 P.2d 981, 986 (Alaska 1971).

an inference of guilt may not be drawn from a failure to speak or to explain when a person has been arrested.[10]

10. United States v. Mullings, 364 F.2d 173, 175 (2d Cir. 1966). *See* United States v. Nolan, 416 F.2d 588, 593–594 (10th Cir. 1969) ; Fowle v. United States, 410 F.2d 48, 50–51 (9th Cir. 1969).

There is also precedent holding that where the accused did not remain silent at the time of arrest a different rule pertains. Thus, in United States v. Cordova, 421 F.2d 471, 474 (9th Cir. 1970), the court said :

There the defendants chose to remain silent at the time of arrest and this silence was used against them at trial. Here the defendant did not choose to remain silent at the time of his arrest or of his subsequent interrogation. Inconsistencies or omissions in his exculpatory explanation and his testimony at trial were properly presented by testimony of the arresting officer and on defendant's cross examination. They did not violate [defendant's] privilege against self-incrimination.

*Compare* United States v. Ramirez, 441 F.2d 950, 954 (5th Cir. 1971), where the court said :

We reject the contention that Ramirez' silence is excludable from the jury's consideration by Miranda v. Arizona, supra [384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694], and hold that the cross-examination falls clearly within the ambit of Harris v. New York, 1971, [401 U.S. 222,] 91 S.Ct. 643 [, 28 L.Ed.2d 1] In *Harris* the court held that while *Miranda* might prevent the use of certain statements obtained without proper warnings in the prosecution's case in chief, such statements could be admitted for the purpose of impeaching the testimony of an accused who took the witness stand.

"Every criminal defendant is privileged to testify in his own defense, or to refuse to do so. But that privilege cannot be construed to include the right to commit perjury. See United States v. Knox, 396 U.S. 77, 90 S.Ct. 363, 24 L.Ed.2d 275 (1969) ; cf. Dennis v. United States, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966). Having voluntarily taken the stand, petitioner was under an obligation to speak truthfully and accurately, and the prosecution here did no more than utilize the traditional truth-testing devices of the adversary process . . .

"The shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances." Harris v. New York supra, 91 S.Ct. at 645–646.

The analogy of *Harris* to the case at hand is inescapable. Once Ramirez elected to testify and assert the defense of coercion he became subject to the "traditional truth-testing devices of the adversary process," including the right of the prosecution to show his prior inconsistent act of remaining silent at the time of his arrest. Thus, the district court was not in error in allowing the government to cross-examine Ramirez about his silence.

The judgment of conviction entered below is affirmed.

Affirmed.