**Dwight WILLIAMS, Appellant,**

v.

**STATE of Alaska, Appellee.**

No. A–2490.

Court of Appeals of Alaska.

March 23, 1990.

Paul E. Malin, Asst. Public Defender, and John B. Salemi, Public Defender, Anchorage, for appellant.

John A. Scukanec, Asst. Atty. Gen., Office of Sp. Prosecutions and Appeals, Anchorage, and Douglas B. Baily, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., COATS, J., and CRASKE, Superior Court Judge.*

OPINION

BRYNER, Chief Judge.

Dwight Williams appeals his conviction for kidnapping, assault in the first degree, and tampering with a witness. We affirm.

---

* Sitting by assignment made pursuant to article  IV, section 16 of the Alaska Constitution.

Williams' principal claim on appeal is that the state was improperly allowed to comment on his pre- and post-arrest silence. Because Williams raised no objection below to the challenged evidence, we review his claim only for plain error. *See Silvernail v. State,* 777 P.2d 1169, 1174 (Alaska App.1989); *Massey v. State,* 771 P.2d 448, 453 (Alaska App.1989); *Potts v. State,* 712 P.2d 385, 390 (Alaska App.1985).

Williams was convicted of kidnapping and first-degree assault for abducting his former female companion, Shelly Manning, and beating her with a baseball bat. He was convicted of tampering with a witness for attempting to convince Manning to alter her testimony concerning the incident. At trial, the evidence established that Manning had separated from Williams shortly before the date of the offenses and had begun living with another man, Jeffery Alex. The state argued that on the date of the offenses, Williams accosted Manning outside Alex's apartment building, forced her into a nearby car, and drove her to his apartment. It contended that Williams assaulted Manning with a baseball bat both in the car and in his apartment.

Jeffery Alex witnessed Manning's abduction and immediately reported it to the police. A witness at Williams' apartment building, who saw Manning being forced upstairs into apartment number 19, also reported the incident.

Two police cars were dispatched to the scene. Upon arrival, Anchorage Police Officer Richard J. Stevens encountered Williams as Williams was walking down the stairs of the apartment building, away from apartment 19. Stevens spoke briefly with Williams. At Stevens' request, Williams allowed Stevens and another officer into apartment 19. Two other men were in the living room of the apartment. The police discovered Manning in one of the bedrooms. She was bleeding, bruised, and wore only a blanket.

Manning initially declined to tell the police what had happened but indicated that she wanted to leave the apartment. The police transported her to a hospital. After receiving treatment at the hospital and being allowed to visit with Jeffery Alex, Manning told the police that Williams had abducted and beaten her. Officer Stevens arrested Williams later the same day. The police made no effort to question Williams, either at the time of their initial encounter with him or upon his arrest later in the day.

The prosecution's theory at trial was that Williams had abducted and assaulted Manning out of jealousy or resentment because she had recently moved out and begun living with Alex. Williams defended against the charges by attempting to establish that it was Alex who had beaten Manning. According to Williams, Manning called him to ask for his help after she had been beaten; Williams picked her up and drove her to his apartment. Williams claimed that he asked Manning if she wanted medical treatment, but she declined. Williams further claimed that Manning fabricated the assault and kidnapping charges because she was jealous over Williams' relationship with other women.

Because Williams was not questioned and did not make any statements to the police on the date of the incident, his defense was revealed for the first time at trial. In an apparent effort to avert the appearance of recent fabrication, Williams attempted to convince the jury that he had been anxious to help Manning and to tell his side of the story on the date of the alleged offenses but had not been given any opportunity to do so. At the outset of trial, Williams' counsel told the jury in his opening statement:

> You're going to hear that they [the police] never asked—the police never asked, when they arrested him, or before, they never asked him what happened. They never—you know, they don't have to ask him. They don't have to read him his *Miranda* rights.... They never bothered to ask, Mr. Williams, what's your version? So—so, here we are in court....

During the state's case-in-chief, Officer Stevens described being dispatched to Williams' apartment building and encountering Williams outside. Stevens said that he asked Williams his name, and Williams

gave him a false first name and no last name. Stevens testified that, after entering apartment 19 with Williams, Williams gave his true name. However, according to Stevens, when asked for a piece of identification with a picture on it, Williams left, saying that his identification card was in a neighboring apartment; he thereafter failed to return to apartment 19.

On cross-examination, defense counsel asked Stevens what Williams had said upon encountering Stevens outside the apartment:

Q: Officer Stevens, when—this first initial contact you have with Mr. Williams, you informed him why you're there. He says—he said something to you, didn't he?

A: Yes.

Q: And he told you, yes, the woman's up in apartment 19. Doesn't he?

A: No, I don't believe he said that.

Q: He said—what did he say? Tell us what he said.

A: He said he doesn't know anything about anything like that.

In response to further questioning by defense counsel, Stevens acknowledged that he never questioned Williams or asked for his version of the incident, either at the apartment or later in the day, when he arrested Williams.

After the state concluded its case-in-chief, Williams took the stand in his own defense. During his testimony, he claimed that when he saw the police drive up to his apartment building, he went downstairs to tell them what had happened. Williams claimed that Stevens approached him and told him the police were looking for a woman who had been beaten and dragged into apartment 19. Williams testified that he told Stevens, "There's a woman in the back bedroom, but this woman hasn't been

dragged to this apartment or beaten in this apartment." According to Williams, however, this was the only information he was able to give to the police. He was never asked any additional questions or given any opportunity to explain the situation.

Williams further testified about the circumstances surrounding his arrest later in the day. He again emphasized that he was never given a chance to tell the police his side of the story:

Q: Now, when the police arrested you, were you at any time asked by the police what your version of what happened [was]?

A: The police never questioned me and the police never questioned—questioned any of the witnesses that was around.

During final arguments to the jury, defense counsel continued to portray Williams as a person who had wanted to help but had never been given a chance to relate his story to the police:

It's too bad—you know, if they're saying, well, he's had all this time to fabricate because he gets the police reports. Well the law allows him to get the police reports. He has to prepare a defense. It's too bad they didn't bother to give him the—the—say, hey, why don't you tell us your side of the story. No. They don't want to hear his side of the story because they've already jumped to the conclusion....

The prosecutor responded to this argument during the closing portion of the state's final argument by pointing out the numerous opportunities that Williams had to assist Manning and to inform the police of his own version of events. The prosecutor emphasized that Williams' failure to say anything was inconsistent with his claim that he had wanted to help Manning but was given no opportunity.[1]

---

1. The prosecutor's comments on Williams' failure to make a statement were contained in the following portion of the state's argument:

Now, compare and contrast that with the defendant's testimony, ladies and gentlemen, because this man is so incredible. He is just incredible. He's so good. He is just so good, so kind, so compassionate, so thoughtful, so

loving, so concerned about Shelly Manning and her welfare. At least that's what he wants you to believe. But interestingly enough, when the police go to the Richmond Street address, he tells you on direct examination that he saw the police arrive and he went downstairs to greet the police to tell them what had happened to Shelly Manning. That

On appeal, Williams focuses for the first time on the state's final argument to the jury and on certain portions of its direct examination of Officer Stevens. Williams alleges that the state impermissibly inquired into and commented on his pre- and post-arrest silence. *See, e.g., Dorman v. State,* 622 P.2d 448 (Alaska 1981); *Gunnerud v. State,* 611 P.2d 69 (Alaska 1980); *Silvernail v. State,* 777 P.2d 1169 (Alaska App.1989); *Nelson v. State,* 691 P.2d 1056 (Alaska App.1984).

The record convincingly establishes, however, that it was Williams, in his opening statement, who broached the topic of his failure to make a statement before or after his arrest. Williams' counsel evidently injected the issue for strategic reasons, hoping to stave off an anticipated claim of recent fabrication by establishing that Williams had never been given a chance to tell his side of the story.

After raising the issue in his opening statement, defense counsel diligently pursued it in his cross-examination of Officer Stevens and on direct examination of Williams. Thereafter, counsel skillfully exploited the issue in his final argument to the jury.

It is apparent that the state's inquiry into and comment on Williams' pre- and post-arrest silence were directly responsive

makes him look real good, doesn't it? Except there's a problem. He lies to the police and gives them the wrong name. They go back upstairs to the apartment where they gain admission to the apartment and they tell him why they're there. He knows that one way or the other they're going to get into that apartment. He can let them in or they can get a search warrant. It doesn't matter, but they're going to get into that apartment. So, he lets them in. That makes him look good. Then they start asking him questions about who he really is. And he comes clean with who he is. And they want a photo ID. And he says, oh, I'll go next door and I'll get my photo ID. I'll be right back. So, he goes to apartment 20, but he never comes back. Now, apartment 20 isn't on the other side of the building. Apartment 20 isn't even on the other side of the street. Apartment 20 is like five steps away from apartment 19. There are at least two police vehicles in the vicinity, and the defendant knows why they're there, knows that they have come to investigate this allegation of a woman being beaten and drug into apartment 19. And what does he do? Instead of assisting the police to help them obtain the culprit who committed this heinous offense, he walks out of the apartment into apartment 20 and doesn't bother to come back. He doesn't tell them about the automobile that was supposedly used to transport her. He doesn't tell them about this bloody towel that supposedly was used to wipe her head. He doesn't tell them where her clothes are in the bathroom. He doesn't bother to bring back a photo ID. He doesn't tell them his version of the events. And that's an important point because this whole bit of testimony about, well, gosh, the police never asked me what my story was is just a lot of crap. Because he had ample opportunity to give his version of the events. And he consciously chose not to. He knew that it was better for him to keep his mouth shut. In fact he decided that disappearing from the scene was the best course of

action, and he never bothered to go back to apartment number 19. Of course he tells us that after the police left, well, then he went back to apartment number 19 and there was nobody there. No. No. The state would submit to you he disappeared from the scene. He walked away. He didn't go get his photo ID. He walked away from the scene. More importantly, later that afternoon he was walking down the street in the vicinity and he sees the police stop the blue vehicle with Marcus, the man who was driving the automobile, the mystery Marcus that nobody has been able to dig up, and his cousin, Tyrone, and he sees the police stop the vehicle, and what does he do? Does he go running up to the police and inquire about Shelly Manning's health? Does he ask where she's been taken? Does he try to offer his version of the events or give them any information? To assist them in their investigation? No. No. He turns around and walks the other direction. And the police call for a backup vehicle so they can find him and arrest him. And then according to his story, prior to this—and I'm absolutely confused as to the sequence of events in his testimony, but at some point prior to his arrest he's supposed to be back in apartment 20 and the cops are leaning against the door listening, and they open the door and they single him out and say, hey, you, out, or something to that effect, or against the wall. And what does he do? Does he bother to inquire about Shelly Manning, her whereabouts or her health, or what's happened to her, or where she is or where she's going to be? No. Does he bother to tell the police what his version of the events are? To help them obtain all of this physical evidence that's apparently lying all over the place? No. No. He turns around and he walks away. Are those the actions of an innocent man? Could a reasonable person, a reasonable person who has not committed these acts, do what he did that day? No. No. But a guilty person would....

to the line of defense that Williams elected to initiate and pursue. Under the circumstances, we find no plain error. *See, e.g., Sidney v. State,* 571 P.2d 261, 263–64 (Alaska 1977); *Davis v. State,* 501 P.2d 1026, 1030 (Alaska 1972); *Weston v. State,* 656 P.2d 1186, 1191 (Alaska App.1982).

■ In his second claim of error, Williams alleges that the state engaged in prosecutorial misconduct during its final argument. Again, however, Williams' claim is subject to review only for plain error since he failed to object below to any of the instances of alleged impropriety.

Williams' claim is threefold. First, he objects to the prosecution's characterization of his defense as "red herrings." In context, however, the challenged remark did not purport to disparage the legitimacy of any legal theory or defense asserted by Williams; rather, it was directed at the substance of Williams' testimony and amounted simply to an argument that Williams' version of events was not credible. We find no error, let alone plain error. *Compare State v. McDonald,* 472 A.2d 424, 425–26 (Me.1984), *with State v. Brown,* 368 N.W.2d 12, 13 (Minn.App.1985), and *People v. Hicks,* 101 Ill.App.3d 238, 56 Ill.Dec. 782, 785, 427 N.E.2d 1328, 1331 (1981).

■ Second, Williams challenges the propriety of a statement by the prosecutor informing the jury that it was entitled to consider, as evidence, Williams' demeanor while he listened to Manning's testimony. The propriety of considering a defendant's non-testimonial demeanor as evidence has never previously been determined in Alaska. Cases decided elsewhere have differed on the issue, depending on the circumstances. *Compare, e.g., United States v. Schuler,* 813 F.2d 978, 980–82 (9th Cir.1987), and *Good v. State,* 723 S.W.2d 734, 736–37 (Tex.Crim.App.1986), *with People v. Edelbacher,* 47 Cal.3d 983, 254 Cal.Rptr. 586, 615–16, 766 P.2d 1, 30 (1989), *People v. Heishman,* 45 Cal.3d 147, 246 Cal.Rptr. 673, 706–08, 753 P.2d 629, 662–63 (1988),

and *Commonwealth v. Smith,* 387 Mass. 900, 444 N.E.2d 374, 380 (1983).

Assuming that it was improper for the jury to consider Williams' non-testimonial demeanor in this case, we find the error to be plainly inconsequential. The prosecutor's single specific request for the jury to consider Williams' non-testimonial demeanor amounted to a passing comment dealing with Williams' reaction to a statement by Manning on a clearly collateral matter. The record does not disclose what Williams' reaction was, but the prosecution characterized it only as "interesting." Under the circumstances, particularly because the jury had otherwise had a full opportunity to observe and evaluate Williams' demeanor while he testified, we find no basis for concluding that the challenged remark amounted to plain error.

■ Williams' third charge of misconduct is somewhat more troublesome. In the closing portion of the state's final argument, the prosecutor said: "So, ladies and gentlemen, go back to the jury room and look at the evidence, and talk about the testimony, and do your job and return guilty verdicts in this case." Insofar as the challenged argument implied that the jury's "job" was to reach a guilty verdict, it was improper. *See Noel v. State,* 754 P.2d 280 (Alaska App.1988). It is significant, however, that the impropriety was tempered by the prosecution's simultaneous admonition to the jury to "look at the evidence and talk about the testimony. . . ."

Under the circumstances, we find that the potential for substantial prejudice was remote. In this regard, we note that, in returning guilty verdicts against Williams for kidnapping, assault in the first degree, and tampering with evidence, the jury also acquitted him of an additional charge of attempted sexual assault. The jury's ability to differentiate among the charges provides a strong indication that it was not improperly influenced by the challenged admonition to "do your job." In the absence of a timely objection below, we find no plain error. *See Potts v. State,* 712 P.2d

385 (Alaska App.1985).[2]

The conviction is AFFIRMED.

SINGLETON, J., not participating.

**2.** Williams has also advanced the subsidiary claim of cumulative error. *See Drumbarger v.* *State,* 716 P.2d 6, 16 (Alaska App.1986). We find no merit to the claim and reject it.