Leroy ADAMS, Petitioner,

v.

STATE of Alaska, Respondent.

No. S–13733.

Supreme Court of Alaska.

Sept. 16, 2011.

Sharon Barr, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for Petitioner.

Terisia Chleborad, Assistant Attorney General, Office of Special Prosecutions & Appeals, Anchorage, and Daniel S. Sullivan, Attorney General, Juneau, for Respondent.

Before: CARPENETI, Chief Justice, FABE, WINFREE, CHRISTEN, and STOWERS, Justices.

*OPINION*

FABE, Justice.

## I. INTRODUCTION

A jury convicted Leroy Adams of sexual assault in the second degree for having sexual intercourse with K.S. when he knew that K.S. was unaware that a sexual act was being committed. Both Adams and K.S. were intoxicated at the time, and Adams testified at trial that the sex was consensual. During his cross-examination of Adams, the prosecutor

questioned Adams about his refusal to speak to the police prior to trial. The prosecutor also argued to the jury in closing that Adams's refusal to talk to the police made his testimony at trial less credible. Adams claimed on appeal that the prosecutor's questions and argument were improper comments on Adams's right to silence under article I, section 9 of the Alaska Constitution. Because Adams did not object to the prosecutor's questions or argument at trial, his claims were reviewed for plain error, and the court of appeals affirmed his conviction. We granted Adams's petition for review and now conclude that the prosecutor improperly commented on Adams's invocation of his right to silence and violated his constitutional rights. We reverse Adams's conviction and remand for a new trial.

## II. FACTS AND PROCEEDINGS

### A. Underlying Facts

On February 7, 2005, K.S. traveled from her home in Kivalina to Kotzebue for a dentist appointment. K.S. was sixteen years old at the time. That night, K.S. was drinking with a friend and consumed about half a bottle of whiskey. She left her hotel room and went to the apartment of Nellie Knox, where K.S.'s cousin Emma Hawley was staying. According to Hawley, K.S. was visibly intoxicated, "banging on the door" of Knox's apartment and "hollering." Hawley tried to convince K.S. to come inside and go to sleep, but K.S. refused and said that she wanted to go out. Hawley left K.S. in the hallway and went back inside Knox's apartment. Going to see Hawley was the last thing that K.S. remembered prior to waking up in Leroy Adams's apartment.

Leroy Adams and his wife Mae Adams lived in the same apartment complex. On the night of February 7 and the early morning hours of February 8, Adams and Mae were drinking whiskey and playing board games in their apartment with Lena Koenig, who described Mae and Adams as her aunt and uncle. Adams and Mae were 47 years old at the time and they knew K.S. from Kivalina. Emma Hawley testified that before she went back inside, she saw Mae call K.S. over to her apartment. According to

Mae, she was outside smoking a cigarette with Adams and Koenig when she noticed that K.S. was so drunk that she was "staggering" and about to "pass out." Because they were concerned that K.S. would freeze outside in the cold, Koenig and Mae had K.S. come back to the Adamses' apartment.

At the Adamses' apartment, K.S. sat or lay on the couch while Adams, Mae, and Koenig continued to drink and play board games. Mae and Adams testified that K.S. wanted to drink more whiskey, but Mae would not give her any. K.S. then got up from the couch and tried to grab the bottle of whiskey, which was near Adams. According to Mae and Adams, K.S. let her shirt slide down and rubbed her breast against Adams's arm before grabbing the whiskey bottle and drinking from it. Adams said that he was also "pretty well intoxicated" at this point.

Koenig and Mae then went back outside to smoke another cigarette and Koenig left the apartment complex. Adams testified that he asked K.S. if she was "coming on to [him]" by "touching [his] elbow with her [breast]" and if "she wanted to get it on while no one was in the apartment." Adams maintained that K.S. voluntarily went into the bedroom with him, that she consented to oral sex, and that she was awake and actively participating. At that point, Mae returned to the apartment, went into the bedroom and saw K.S. lying on the bed with Adams's "head between her legs." Mae testified that K.S. was awake "because she had her eyes open," but that neither Adams nor K.S. said anything. Mae also claimed that she "tried to stop [Adams]," but that he "put out his arm, and [she] blacked out after that." According to Adams, he shoved Mae when Mae tried to pull him off K.S., and Mae then went back to the living room.

Adams further testified that a few minutes later, Mae returned to the bedroom and began touching K.S.'s breasts. He claimed that he told Mae to leave and then asked K.S. if they could have vaginal intercourse. According to Adams, K.S. consented, and afterward "we both realized what we had done, and she wanted to get out of the apartment as quickly as she can [sic]." He said that K.S. got

dressed, went to the bathroom, and left after calling Emma Hawley to ask her to open the door to Nellie Knox's apartment. Adams and Mae then continued drinking and fell asleep until the police knocked on their door the next morning.

K.S. testified that after talking to Hawley outside Knox's apartment, the next thing she remembered was waking up with Adams on top of her engaged in vaginal intercourse. K.S. maintained that she did not consent and also alleged that Mae was in the room "playing with [K.S.'s] bottom." According to K.S., when she woke up, Adams got off of her, and she went to the bathroom, dressed, and called Hawley.

When Hawley answered the phone, K.S. was crying and said "I'm hurting and I don't know what to do" and "she pushed me ... with her breasts." K.S. asked Hawley to open the door to Knox's apartment. When K.S. arrived at Knox's apartment, she was still crying and had left her shoes behind. K.S. told Hawley, "I'm hurting" and "it hurts when I pee," and then she went back to sleep. Based on K.S.'s statements, Hawley told her uncle that K.S. had been raped. Hawley's uncle then called the Alaska State Troopers.

## B. The Investigation

Trooper Ron Monigold arrived at the apartment complex around 8:30 a.m. on February 8. He met with K.S. and observed that she was upset and crying and appeared to still be intoxicated. Trooper Monigold took K.S. to the hospital, where she underwent a sexual assault examination and gave a statement to the police.

Trooper Monigold then returned to the apartment complex and made contact with Adams around 10:00 a.m. Trooper Monigold smelled alcohol on Adams's breath and spoke to Adams for about five to ten minutes.

Adams told Trooper Monigold that the previous evening Adams and Mae had been outside smoking when they saw K.S. passed out on the stairs. Adams said that they first took K.S. to her friend's apartment (presumably the apartment of Nellie Knox), and that later K.S. came to their apartment. At some point during the interview, Adams told Trooper Monigold that he no longer wanted to answer questions. Trooper Monigold asked Adams to accompany him to the hospital for a sexual assault exam and mentioned that it was in Adams's best interest to make sure that he had not contracted a sexually transmitted disease. Adams agreed to accompany the trooper to the hospital, where a DNA specimen was obtained from him for a sexual assault suspect kit.

The sexual assault exams showed that DNA from the sperm collected from K.S.'s vagina was a statistical match to Adams's DNA. On August 26, 2005, Leroy and Mae Adams were each indicted on one count of sexual assault in the second degree.[1]

## C. The Prosecutor's Disputed Remarks

The case against Leroy and Mae Adams was scheduled for trial in November 2005. On the eve of trial, Mae Adams reached an agreement with the State to plead no contest to misdemeanor fourth-degree assault. This agreement allowed Mae to avoid the possibility of a felony conviction and sex offender registration. Mae agreed to a sentence of 360 days jail time with 270 days suspended and 90 days to serve and also agreed to testify at Adams's trial. The case against Leroy Adams proceeded to trial.[2]

During the State's case-in-chief on Thursday, November 17, the prosecutor took steps to make sure that the jury was not informed that Adams invoked his right to silence prior to trial. In the middle of his direct examination of Trooper Monigold, the prosecutor

---

**1.** Leroy was indicted under AS 11.41.420(a)(3)(C), which provides that an offender commits the crime of sexual assault in the second degree if "the offender engages in sexual penetration with a person who the offender knows is unaware that a sexual act is being committed." Mae was indicted under AS 11.41.420(a)(1), which provides that an offender commits the crime of sexual assault in the sec-

ond degree if "the offender engages in sexual contact with another person without consent of that person."

**2.** We note that the trial attorneys for Adams and the State were not the same attorneys who handled the appeal.

asked for a sidebar and told the judge, "I want to play a portion of the taped interview with the defendant and Trooper Monigold. What we want to make sure is that it's only that portion of statements that he made not about his right—exercising his right to remain silent." Adams's attorney did not object to the tape, but agreed that he was concerned "that it doesn't get slipped in that [Adams] exercised his right." When the trial judge determined that the tape was of too poor a quality to play for the jury, the prosecutor agreed to question Trooper Monigold about the interview without asking any questions about Adams's invocation of his right to remain silent.

A similar exchange occurred during the redirect examination of Trooper Monigold. Prior to asking follow-up questions about the interview, the prosecutor requested a sidebar with the witness and cautioned Trooper Monigold: "Do not refer to his right to remain silent or the fact that he exercised his right to remain silent.... Where you can't go is, I tried to ask him this and he said, I want to talk to my attorney, or he didn't want to tell me anything else."

The remarks at issue in this appeal came when the trial reconvened four days later on Monday, November 21, and Adams took the stand in his own defense. On cross-examination, the prosecutor asked Adams about his conversation with Trooper Monigold on February 8:

Q: Do you remember talking to Officer Monigold?

A: Yes, I do.

Q: Okay. Do you remember him—remember telling him that you saw a passed-out female that you identified as [K.S.]?

A: Yes, I do.

Q: Okay. And that you were outside and you saw her again, this time awake?

A: Yes, I do.

Q: And that your wife called her over, she came into the house?

A: The second trip, it was on the second time around.

Q: Okay. And then you stated that Lena Koenig was in the apartment with you and your wife?

A: Yes, she was.

Q: *And then you refused to talk to police any further.* Correct?

A: That's right.

Q: Okay. *Until today?*

A: *I was exercising my right.*

Q: Okay. You've heard from the victim in this case, correct? You've been sitting right over there?

A: Yes, I did.

Q: You've heard from your wife? You've heard her testify while sitting right over there? Correct?

A: Yes, I did.

(Emphasis added.) A few minutes later, the following exchange occurred between the prosecutor and Adams:

Q: Now, new information that we heard from you today is everything that happened in your apartment, correct? Would you agree to that? From your perspective?

A: What do you mean by everything?

Q: Well, we didn't know anything about what happened in your apartment from you, *because you didn't talk to police, until after hearing all the evidence so far in this case.*

A: *I assumed I had the right to remain silent until . . .*

Q: Okay.

A: *. . . I choose* [sic] *to testify.*

(Emphasis added.)

During his closing argument, the prosecutor pointed to Adams's silence to argue that Adams's testimony was less credible than the victim's.[3] The prosecutor first argued that Adams changed his decision not to talk when he learned about the DNA evidence indicating that he had sex with K.S.:

---

**3.** Due to scheduling conflicts the closing arguments in the case did not occur until almost a month later, on December 20.

But before we get to the defendant's testimony, that night, [K.S.] woke up. The defendant was on top of her. She ran over to the house where Emma Hawley was after calling [Emma], and the police investigated. Defendant's wife Mae said she was too drunk to remember what happened. *Defendant said: Victim came into the house; I don't have anything else to say.*

. . . .

The victim was interviewed and a sexual assault exam was conducted. Evidence was collected. DNA was found and typed from semen that was taken, found from the vaginal swab from the victim.

. . . .

But we don't—it's not a—this case is not a fight over the DNA. Right? Because upon the investigation, upon finding of DNA, and after months and months of thought, what is the defendant's story now? It was consensual. What does he have to say? He has to say that sex occurred. Right? He can't say it didn't occur. He can't stick with the story that, I'm not going to tell you what happened. And because he decided to testify, you get to scrutinize his testimony.

(Emphasis added.) The prosecutor also argued in closing that the defendant's testimony at trial was not as credible as the victim's because it was inconsistent with his earlier decision not to speak to the police:

*Defendant doesn't want to talk.* . . . On that morning the victim's testimony was consistent with what she testified here. There are two people whose testimony was not consistent with what they told police on February 8th: The defendant and his wife. So using your reason, logic, and your common sense, you get to determine why that would be.

(Emphasis added.) Finally, the prosecutor again mentioned Adams's silence in order to argue that K.S. was the most credible witness:

Do you believe the victim who was intoxicated and whose version of what happened was consistent the moment she called from the house, went to Emma Hawley's house, was investigate—was talking to police, and then testified here, all of that was consistent? Or do you believe someone who was too drunk—that is Mae Adams—and then she has all this recollection of what happened at trial. And the defendant who says: Yeah, she came in; *I don't want to say anything else;* DNA is fine, it's him; yeah, it was consensual? Who do you believe?

(Emphasis added.) Adams did not object to the prosecutor's line of questioning during cross-examination or the prosecutor's repeated references to Adams's silence during closing argument. The jury convicted Adams of second-degree sexual assault.

### D. Appellate Proceedings

On appeal, Adams claimed that it was plain error for the trial court to allow the prosecutor's argument and line of questioning because the prosecutor improperly commented on Adams's right to remain silent.[4] The court of appeals decided that the prosecutor's comments only pertained to Adams's pre-arrest silence and that the comments on pre-arrest silence did not constitute plain error.[5] The court of appeals reasoned that under federal law, if a defendant testifies at trial, the prosecution is free to cross-examine him regarding his failure to make a statement prior to receiving *Miranda* warnings,[6] and that under Alaska law evidence of pre-arrest silence is only inadmissible if it is more prejudicial than probative under Alaska Evidence Rule 403.[7] The court of appeals concluded that Adams had no claim under federal law;[8]

---

**4.** *Adams v. State (Adams I )*, Mem. Op. & J. No. 5363, 2008 WL 2779195, at *1 (Alaska App., July 16, 2008).

**5.** *Id.* at *2–3.

**6.** *Id.* at *1; *see Fletcher v. Weir*, 455 U.S. 603, 606–07, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982) (per curiam); *Jenkins v. Anderson*, 447 U.S. 231, 238–39, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980).

**7.** *Adams I,* 2008 WL 2779195, at *2; *see Silvernail v. State*, 777 P.2d 1169, 1174–78 (Alaska App.1989).

**8.** *Adams I,* 2008 WL 2779195, at *2.

that his claim under state law was at best "debatable";[9] and that the prosecutor's comments thus did not constitute plain error because "[i]f a claim of error is reasonably debatable—if reasonable judges could differ on what the law requires—then a claim of plain error fails."[10]

We granted Adams's petition for hearing on this issue and remanded to the court of appeals for consideration of whether the prosecutor improperly commented on Adams's post-arrest silence and whether those comments amounted to plain error.[11] On remand, the court of appeals recognized that "the prosecutor twice referred to the fact that Adams had continued to remain silent up until the time of his trial,"[12] but it concluded that even if the prosecutor improperly commented on Adams's post-arrest silence, there was no plain error.[13] The court of appeals ruled that it was Adams's burden to establish "that the claimed error was so prejudicial to the fairness of the proceedings that the failure to correct it would perpetuate manifest injustice."[14] Noting that the sexual assault was reported on February 8, 2005, that Adams was arrested in July 2005, and that the trial occurred in November 2005, the court of appeals compared the periods of pre-arrest and post-arrest silence, reasoning that "the period of post-arrest silence in Adams's case accounts for less than half of the nine months that elapsed" between the assault and the trial.[15] Therefore, the court concluded, if comment on Adams's pre-arrest silence did not undermine the fairness of the proceedings, neither did any comment on Adams's post-arrest silence, because "[t]o the extent that Adams kept silent during these nine months, the majority of this silence was *pre*-arrest silence."[16] Adams again petitioned this court for hearing, and we granted the petition.

## III. STANDARD OF REVIEW

■ Alaska Criminal Rule 47(b) allows appellate courts to notice "[p]lain errors or defects affecting substantial rights ... although they were not brought to the attention of the court." Adams did not object at trial to the prosecutor's questioning or argument concerning his pre-trial silence. We thus "look to see whether the trial court committed plain error."[17] Plain error is an error that (1) was not the result of intelligent waiver or a tactical decision not to object; (2) was obvious; (3) affected substantial rights; and (4) was prejudicial.[18] We have described plain error as "involv[ing] such egregious conduct as to 'undermine the fundamental fairness of the trial and contribute to a miscarriage of justice.' "[19]

## IV. DISCUSSION

### A. Alaska Law Protects A Criminal Defendant's Pre–Arrest And Post–Arrest Silence.

■■ Alaska law provides greater protection than federal law for a criminal defendant's right to remain silent both before and after arrest. Under the United States Constitution, the Due Process Clause of the Fourteenth Amendment prohibits a state from cross-examining a defendant about his decision to remain silent after receiving *Miranda* warnings.[20] In *Doyle v. Ohio*, the

---

9. *Id.* at *3.

10. *Adams I*, 2008 WL 2779195, at *3 (quoting *Simon v. State*, 121 P.3d 815, 820 (Alaska App. 2005)).

11. *Adams v. State* (*Adams II*), Mem. Op. & J. No. 5550, 2009 WL 4758732, at *1 (Alaska App., Dec. 9, 2009).

12. *Id.*

13. *Id.* at *6.

14. *Id.* (citing *Burton v. State*, 180 P.3d 964, 968 (Alaska App.2008)).

15. *Id.* at *5.

16. *Id.* at *5–6.

17. *Raphael v. State*, 994 P.2d 1004, 1015 (Alaska 2000).

18. *See infra* Part IV.C.1.

19. *Raphael*, 994 P.2d at 1015 (quoting *United States v. Young*, 470 U.S. 1, 16, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985)).

20. *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976).

United States Supreme Court concluded that "while it is true that the Miranda warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings."[21] The *Doyle* court thus held that "it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial."[22] In subsequent decisions, however, the U.S. Supreme Court concluded that the U.S. Constitution does not prohibit a state from cross-examining a defendant about his failure to give a statement prior to arrest or prior to receiving *Miranda* warnings.[23]

■ In contrast, Alaska case law protects a criminal defendant's right to remain silent both before and after arrest. As we explain below, evidence of a defendant's post-arrest silence is prohibited by the Alaska Constitution, and evidence of a defendant's pre-arrest silence will usually be inadmissible under Evidence Rule 403 due to its inherently low probative value and its high risk of unfair prejudice.

■ Article I, section 9 of the Alaska Constitution provides in part that "[n]o person shall be compelled in any criminal proceeding to be a witness against himself." "Implicit in this right is the notion that when an accused person chooses to exercise his right to silence, such silence may not be commented upon."[24] And we have held that article I, section 9 prohibits the state from using a defendant's post-arrest silence for substantive or impeachment value, even if the defendant did not receive *Miranda* warnings. In a 1972 case, *Davis v. State*, we expressed "our disapproval of any comment absent waiver by the prosecution on an accused's silence resulting from the exercise of his constitutional rights.... [A]n inference of guilt may not be drawn from a failure to speak or to explain when a person has been arrested."[25] A 1976 concurring opinion written by Chief Justice Boochever and joined by Justice Rabinowitz further explained that "evidence of silence in the face of custodial interrogation by police is not properly admissible in a trial."[26] In *Gunnerud v. State*, a 1980 case, we reversed a conviction where the prosecutor had played a recording for the jury that included the defendant exercising her right to remain silent.[27] In that case the prosecutor used the tape during his case-in-chief, and it concerned silence after *Miranda* warnings had been administered. We observed that "[i]t is well settled that prosecutorial comment on silence for substantive or impeachment value is constitutionally prohibited. [We have] specifically disapproved *any* comment upon a defendant's exercise of the right to remain silent."[28] Finally, one year after *Gunnerud* in *Dorman v. State*, we held that plain error occurred when the prosecutor told the jury in closing argument that they should infer guilt from the defendant's silence during the period after his arrest but prior to receiving *Miranda* warnings.[29]

21. *Id.* at 618, 96 S.Ct. 2240.

22. *Id.*

23. *Fletcher v. Weir*, 455 U.S. 603, 606–07, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982) (per curiam) (covering post-arrest, pre–*Miranda* silence); *Jenkins v. Anderson*, 447 U.S. 231, 238–39, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980) (covering pre-arrest silence).

24. *Coleman v. State*, 553 P.2d 40, 50 (Alaska 1976).

25. 501 P.2d 1026, 1030–31 (Alaska 1972).

26. *Coleman*, 553 P.2d at 53 (Boochever, C.J., concurring).

27. 611 P.2d 69, 75–76 (Alaska 1980).

28. *Id.* at 75 (emphasis added) (internal citations omitted).

29. 622 P.2d 448, 456–59 (Alaska 1981). *Dorman* was decided prior to the U.S. Supreme Court's decision in *Fletcher v. Weir*, 455 U.S. 603, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982) (per curiam), which held that the use of post-arrest, pre–*Miranda* silence for impeachment purposes did not violate the federal constitution. But two years after *Fletcher*, the court of appeals reaffirmed *Dorman* in *Nelson v. State*, 691 P.2d 1056 (Alaska App.1984), holding that *Dorman* remained the correct interpretation of article I, section 9 of the Alaska Constitution and therefore "a person who is under arrest for a crime cannot normally be impeached by the fact that he was silent following his arrest." *Id.* at 1059.

Neither this court nor the court of appeals has decided whether the Alaska Constitution prohibits the state from using evidence of a defendant's pre-arrest silence.[30] But we do not need to decide that question in this case for two reasons. First, at the very least, Alaska law protects a defendant's pre-arrest silence through the rules of evidence, and in this case, evidence of Adams's pre-arrest silence was inadmissible under Evidence Rule 403. Adams has shown that the admission of this evidence was plain error.[31] And second, in this case the prosecutor violated Adams's constitutional rights by commenting on Adams's *post*-arrest silence. Allowing the prosecutor's comments to be presented to the jury also amounted to plain error.[32]

In *Silvernail v. State,* the court of appeals held that it was plain error for the trial court to admit evidence of the defendant's pre-arrest silence because the inherently low probative value of the defendant's silence was outweighed by the danger of unfair prejudice under Evidence Rule 403.[33] Silvernail was charged with murder and testified on his own behalf, attempting to establish a defense of duress.[34] On cross-examination, the prosecutor questioned Silvernail about why he did not explain his claim of duress when he was initially stopped by police.[35] Silvernail's counsel objected on Fifth Amendment grounds, but the trial court ruled that questions about Silvernail's pre-arrest silence were admissible.[36]

The court of appeals held that although the trial court was correct in its reasoning that the federal constitution only prohibits evidence of post–*Miranda* silence, the trial court should have excluded the evidence of Silvernail's pre-arrest silence under Evidence Rule 403.[37] The court of appeals noted that despite the U.S. Supreme Court's interpretation of the federal constitution, "numerous state courts have continued to condemn evidence of pre–*Miranda* silence," relying on both state constitutional provisions and the rules of evidence.[38] The court of appeals further recognized that whether it is grounded in constitutional protections or evidentiary principles, the prohibition on using evidence of a defendant's silence is motivated by the same concerns: "The underlying rationale of the constitutional bar against admitting evidence of a defendant's post-arrest silence is the concern that such evidence is only minimally probative, while possessing a high potential for prejudice to the defendant's case. This is the same basic concern expressed in Alaska Rule of Evidence 403."[39] The court of appeals reiterated that "the Alaska Supreme Court and this court have both expressed distrust of silence as probative evidence of guilt. [Alaska courts] have previously recognized the low probative value of silence, as well as its concomitantly high potential for prejudice."[40]

---

30. *See Bloomstrand v. State,* 656 P.2d 584, 587 (Alaska App.1982) ("The propriety of comment on pre-arrest silence under the Alaska Constitution has not specifically been addressed."); *see also Silvernail v. State,* 777 P.2d 1169, 1175 (Alaska App.1989) ("While *Bloomstrand* recognized that evidence of pre-arrest silence is not precluded as a matter of federal constitutional law, the case expressly left open the issue of admissibility of such evidence under Alaska law."). We have previously interpreted article I, section 9 of the Alaska Constitution "more broadly than the U.S. Supreme Court has construed the Fifth Amendment of the Federal Constitution." *Munson v. State,* 123 P.3d 1042, 1049 n. 48 (Alaska 2005).

31. *See infra* Part IV.C.2.

32. *Id.*

33. *Silvernail,* 777 P.2d at 1174–79. Evidence Rule 403 provides: "Although relevant, evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

34. *Silvernail,* 777 P.2d at 1171.

35. *Id.* at 1172.

36. *Id.* at 1172–73.

37. *Id.* at 1174–78. The court of appeals reviewed this claim under the plain error rule because Silvernail did not base his objection at trial on Evidence Rule 403. *Id.* at 1174.

38. *Id.* at 1175.

39. *Id.* at 1174.

40. *Id.* at 1175 (internal citations omitted).

The court of appeals went on to discuss why the probative value of a defendant's silence is inherently low. The court of appeals observed that while silence can potentially be probative "under circumstances in which it would have been natural for the accused to speak," there are many reasons why an accused's "natural" response would be to remain silent.[41] A defendant's silence might be motivated by fear or intimidation; a failure to understand the question or realize that a reply was necessary; an unwillingness to incriminate another; mistrust of law enforcement; or simply an awareness of his right to remain silent.[42]

The court of appeals concluded that, given these various motivations for silence, "distinctions between pre-arrest, post-arrest, and post–*Miranda* silence" are of "little significance" when "the issue is whether the accused's silence is probative of guilt."[43] The court of appeals noted that although Silvernail had not yet been arrested, he was "engaged by the police in a plainly confrontational setting" and "was clearly not obligated to respond to the officers who stopped him. His silence may well have reflected nothing more than his awareness of and reliance on this right."[44] Reiterating that "the potential prejudice from this line of inquiry is both obvious and substantial," the court of appeals held that evidence of Silvernail's pre-arrest silence was "plainly improper under Alaska Rule of Evidence 403."[45]

*Silvernail*'s conclusion that there is little to distinguish between pre-and post-arrest silence when the issue is whether an accused's silence is probative of guilt is sound, and we adopt it. We recognize that Evidence Rule 403 is a balancing test and thus necessarily contemplates a case where evidence of pre-arrest silence is more probative than prejudi-

cial. Given the numerous reasons that silence can be a natural response, in most cases an accused's pre-arrest silence will be ambiguous at best, and the high potential for unfair prejudice will require evidence of pre-arrest silence to be prohibited for substantive or impeachment value. Of course, any evidence of post-arrest silence, whether or not *Miranda* warnings were administered, remains prohibited under article I, section 9 of the Alaska Constitution.

## B. The Prosecutor's Comments On Adams's Silence Were Not Justified.

■ Adams argues that the prosecutor's remarks encompassed both his pre-arrest and post-arrest silence and therefore were inadmissible under either theory discussed above. The State does not dispute that the prosecutor referenced Adams's silence, but responds that distinctions between pre- and post-arrest silence, or even between state and federal law, are unimportant in this case because "there is one common circumstance in which it is entirely proper for the prosecutor to mention a defendant's silence to the jury.... [I]t is proper for the prosecutor to reference a defendant's silence when the defendant himself has put his silence into question."[46] The State maintains that Adams argued through his counsel that he had been denied the opportunity to tell his side of the story, and therefore "opened the door for the prosecutor to make valid references to Adams'[s] pre- and post-arrest silence."

The State points to two statements made by Adams's lawyer to support its argument. First, during his opening statement after the State's case-in-chief, defense counsel told the jury:

> This case basically has to do with the credibility of the witnesses and what you

---

41. *Id.* at 1176–77.

42. *Id.* at 1177–78 (citing *United States v. Hale*, 422 U.S. 171, 177, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975); *People v. Conyers*, 52 N.Y.2d 454, 438 N.Y.S.2d 741, 420 N.E.2d 933, 935 (1981); *Farley v. State*, 717 P.2d 111, 112 (Okla.App.1986)).

43. *Id.* at 1177.

44. *Id.* at 1178 (internal citations and quotation marks omitted).

45. *Id.*

46. *See United States v. Robinson*, 485 U.S. 25, 32, 108 S.Ct. 864, 99 L.Ed.2d 23 (1988) (holding that where "the prosecutor's reference to the defendant's opportunity to testify is a fair response to a claim made by defendant or his counsel" there is no violation of the privilege against self-incrimination).

believe from what [K.S.] told you and what Mr. Adams is going to tell you. Promise you right now, Mr. Adams is going to testify. *Mr. Adams has been waiting since February to tell you his side of the story.* He wants you to hear the other side of the story so that you can make a decision. . . .

(Emphasis added.) The State argues that the sentence "Mr. Adams has been waiting since February to tell you his side of the story" creates a "reasonable inference" that "those with authority, specifically the police, had denied Adams the opportunity to tell his version of what had happened between him and K.S." The State further contends that Adams's counsel "planted the seed" for this inference when he cross-examined Lieutenant Swisher, one of the police officers involved in the case, and asked, "[a]nd you didn't interview Leroy Adams in connection with this case, did you?"

The State's argument with respect to the cross-examination of Lieutenant Swisher ignores the context of defense counsel's questions. Lieutenant Swisher testified very briefly that he took over the case from Trooper Monigold, sent evidence to the crime lab, and conducted follow-up interviews. On cross-examination, Adams's counsel asked Lieutenant Swisher only three questions establishing that he came into the case a few weeks after the incident and did not interview Adams or K.S. It is obvious from the transcript that these questions were meant to demonstrate that Lieutenant Swisher had only minimal involvement in the case, not that he prevented Adams from telling his side of the story or that the "police had not properly investigated [the] case."

We turn next to defense counsel's opening statement. When read as a whole, and in the context of the rest of the defense case, it would be unreasonable to interpret that statement as an argument that the police had prevented Adams from telling his side of the story. Defense counsel's opening statement was short and unremarkable:

Good morning. Just a few quick words before we present our case. I think that given what you saw last week, where you saw that large list of witnesses that were going to testify, you were told that there was going to be some scientific evidence in this case, you—told that there were going to be some doctors testifying in this case. I think this case is going to play out to be a little more simple than what you guys first saw last week when you came in here. This case basically has to do with the credibility of the witnesses and what you believe from what [K.S.] told you and what Mr. Adams is going to tell you. Promise you right now, Mr. Adams is going to testify. Mr. Adams has been waiting since February to tell you his side of the story. He wants you to hear the other side of the story so that you can make the decision about whether or not [K.S.] was aware that she was having sexual intercourse with him at the time. Because that's all this case is about. It's very simple. Don't think there's any question about whether or not there was intercourse between Mr. Adams that night and [K.S.]. It's going to be whether she was aware of it and whether he knew that she was aware of it.

After you hear all the evidence, we think that you will not be able to find beyond a reasonable doubt that Mr. Adams is guilty of this crime. Thank you.

Nothing in defense counsel's statement suggests that the police denied Adams a chance to tell his side of the story or that the defense planned to advance any theory of police misconduct. It is clear that when defense counsel repeatedly said "you," he was addressing the members of the jury and simply meant to emphasize that Adams was eager to testify.[47] The State's argument that defense counsel created a "reasonable inference" that the authorities denied Adams the chance to tell his side of the story would perhaps be more persuasive if there were any other evidence in the transcript that showed the defense pursuing this theory.

---

47. Furthermore, by the time defense counsel gave his opening statement, the jury had already heard testimony from Trooper Monigold that he interviewed Adams the morning after the inci-

dent, so it would seem very odd for Adams to argue that the police prevented him from giving a statement.

But nothing in Adams's testimony or any aspect of the defense case supports the claim that Adams was suggesting the police mishandled the case or prohibited Adams from explaining his side of the story.

This is particularly apparent in comparison to the case the State cites in support of its argument. In *United States v. Robinson,* the defendant chose not to testify, and in closing argument defense counsel contended that the government had "breached its duty to be fair" and "had unfairly denied [Robinson] the opportunity to explain his actions." [48] In rebuttal, the prosecutor told the jury that Robinson "could have taken the stand and explained it to you, anything he wanted to." [49] The U.S. Supreme Court concluded that "the prosecutorial comment did not treat the defendant's silence as substantive evidence of guilt, but instead referred to the possibility of testifying as one of several opportunities which the defendant was afforded, contrary to the statement of his counsel, to explain his side of the case." [50] The Court held that although the prosecutor could not "on his own initiative" ask the jury "to draw an adverse inference from a defendant's silence," the prosecutor was permitted to give a "fair response" to claims made by Robinson or his counsel.[51]

This case is distinguishable from *Robinson* for two reasons. First, the defense counsel in *Robinson* expressly claimed that the government had denied Robinson the ability to tell his side of the story; here, the State's argument that defense counsel created a "reasonable inference" of such a theory is unpersuasive. Second, the remarks made by the prosecutor in *Robinson* were a direct response to defense counsel's claims, while in this case, the prosecutor never indicated that he was responding to an argument made by Adams, and instead appeared to comment on Adams's silence "on his own initiative." [52]

■ The State also argues that the prosecutor's comments on Adams's silence were justified because they were a legitimate method of demonstrating inconsistencies in Adams's testimony and of reminding the jury that because Adams testified last he could tailor his testimony to the prosecution's case. These arguments are without merit. The State was of course free to cross-examine Adams on any inconsistencies between the statement he gave to Trooper Monigold the morning after the incident and Adams's testimony at trial. But the prosecutor's argument that Adams's *silence* the morning after the assault was inconsistent with his testimony at trial was wholly impermissible. This is precisely what the law prohibits, because as the U.S. Supreme Court has concluded, "it would be fundamentally unfair" to allow "silence to be used to impeach an explanation subsequently offered at trial." [53] Similarly, while the State is correct that "a prosecutor may point out to the jury that the defendant, by going second, has the opportunity to tailor his defense to the government's evidence," [54] the prosecutor remains forbidden from commenting on a defendant's pre-trial silence as part of such an argument.

Because Adams did not open the door to the prosecutor's comments, the prosecutor's

48. *Robinson,* 485 U.S. at 27, 108 S.Ct. 864 (internal quotation marks omitted).

49. *Id.* at 28, 108 S.Ct. 864.

50. *Id.* at 32, 108 S.Ct. 864.

51. *Id.*

52. *See id.*

53. *Doyle v. Ohio,* 426 U.S. 610, 618, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976) (referring to post-arrest silence). The State's reliance on our decision in *Davis v. State,* 501 P.2d 1026 (Alaska 1972), and the court of appeals' decision in *Weston v. State,* 656 P.2d 1186 (Alaska App.1982), *rev'd on other grounds, Weston v. State,* 682 P.2d 1119 (Alaska 1984), is misplaced. In *Davis,* the defendant claimed that her statements to the police immediately after her arrest were evidence of innocence, and the prosecutor pointed out in response that Davis did not provide her full exculpatory story upon arrest. *Davis,* 501 P.2d at 1029–30. In *Weston,* the defendant claimed that he cooperated fully with the police, and the prosecutor pointed out in response that during his first interview Weston became silent and stopped cooperating. *Weston,* 656 P.2d at 1190. In both cases, the defendants opened the door to comments on their silence, but neither case is analogous to the facts here.

54. *See Portuondo v. Agard,* 529 U.S. 61, 120 S.Ct. 1119, 146 L.Ed.2d 47 (2000); *Gray v. State,* 463 P.2d 897, 907 (Alaska 1970).

remarks were improper, whether under article I, section 9 of the Alaska Constitution or under Evidence Rule 403. Adams contends that the prosecutor's remarks amounted to a state constitutional violation because two exchanges during the cross-examination addressed Adams's post-arrest silence:

Q: *And then you refused to talk to police any further.* Correct?

A: That's right.

Q: Okay. *Until today?*

A: *I was exercising my right.*

. . . .

Q: Now, new information that we heard from you today is everything that happened in your apartment, correct? Would you agree to that? From your perspective?

A: What do you mean by everything?

Q: Well, we didn't know anything about what happened in your apartment from you, *because you didn't talk to police, until after hearing all the evidence so far in the case.*

(Emphasis added.) Adams argues that the references in this passage to "until today" and "until after hearing all the evidence so far in this case" necessarily encompassed his post-arrest silence because he was arrested prior to the trial.

We agree with Adams that some of the prosecutor's remarks commented on his post-arrest silence. But the distinction between pre-arrest and post-arrest silence is not particularly important in this case because the prosecutor's comments would be inadmissible under *Silvernail* even if they concerned only pre-arrest silence. The inherently low probative value of pre-arrest silence and its concomitantly high risk of unfair prejudice are no different here than in the facts confronted by the *Silvernail* court. Adams, like Silver-

nail, was "engaged by the police in a plainly confrontational setting," and "[h]is silence may well have reflected nothing more than his awareness of and reliance on [his rights]."[55] The risk of unfair prejudice outweighed any possible probative value of Adams's pre-arrest silence, and therefore any comment by the State on that silence was inadmissible under Evidence Rule 403. This conclusion, however, is only the first part of our inquiry because Adams's counsel failed to object to the prosecutor's remarks at trial. We thus turn to whether the prosecutor's remarks were not only prohibited under *Silvernail* and the Alaska Constitution, but also amounted to plain error.

## C. The Prosecutor's Remarks Amounted To Plain Error: They Affected Substantial Rights And Were Obviously Prejudicial.

### 1. The plain error rule

Review of a criminal defendant's claim of error not raised at trial is governed by Alaska Criminal Rule 47(b), which provides: "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Our cases applying Criminal Rule 47(b), however, are in conflict with recent decisions of the court of appeals. We take this opportunity to clarify the standard for plain error review under Criminal Rule 47(b).

As an initial matter, our cases have consistently held that plain error does not exist where the right at issue was intelligently waived or the defendant's decision not to object to the error was strategic or tactical.[56]

Moreover, beginning in the mid–1970s, our cases began to consistently define plain error as error that affects substantial rights and is obviously prejudicial.[57] We have generally

55. *Silvernail v. State*, 777 P.2d 1169, 1178 (Alaska App.1989).

56. *Dorman v. State*, 622 P.2d 448, 457–58 (Alaska 1981); *Owens v. State*, 613 P.2d 259, 261–62 (Alaska 1980); *Pulakis v. State*, 476 P.2d 474, 479–80 (Alaska 1970); *Hammonds v. State*, 442 P.2d 39, 42–43 (Alaska 1968).

57. *Larson v. State*, 569 P.2d 783, 787 (Alaska 1977); *Hampton v. State*, 569 P.2d 138, 147

(Alaska 1977); *Davenport v. State*, 543 P.2d 1204, 1206 n. 1 (Alaska 1975); *Thomas v. State*, 522 P.2d 528, 531 n. 16 (Alaska 1974); *Martin v. State*, 517 P.2d 1399, 1402 (Alaska 1974). Some cases use the term "substantive rights" instead of "substantial rights." *Dorman v. State*, 622 P.2d 448, 457 (Alaska 1981); *Tuckfield v. State*, 621 P.2d 1350, 1352 (Alaska 1981); *Calder v. State*, 619 P.2d 1026, 1029 n. 7 (Alaska 1980); *Gilbert v. State*, 598 P.2d 87, 92 (Alaska 1979); *Torres v.*

interpreted "affects substantial rights" to mean that the alleged error must "raise[ ] a substantial and important question"[58] such that a failure to address it could "undermine the fundamental fairness of the trial and contribute to a miscarriage of justice."[59] The phrase "obviously prejudicial" has come to encompass two requirements—that the error be both obvious *and* prejudicial.[60] A review of our case law shows that in order for a court to find plain error, the error must not be the result of an intelligent waiver or a strategic decision not to object; the error must affect substantial rights; the error must be obvious; and the error must be prejudicial.

Confusion has persisted, however, over how to apply this standard when the alleged error is a constitutional violation. In our earliest case to directly address this subject, *Burford v. State*, we held that "[d]enial of a constitutional right, in the normal case, would affect substantial rights and give rise to plain error" unless the State proves that the error was "harmless beyond a reasonable doubt."[61] If the error was harmless beyond

a reasonable doubt, "the rights of the accused are not prejudiced and the requirements of plain error have not been met."[62] In contrast, in cases where the alleged error was not a constitutional violation, we applied our traditional harmless error standard of whether the defendant has shown that the error appreciably affected the jury's verdict.[63] In other words, *Burford* identified two differences in applying the plain error doctrine to constitutional violations: First, constitutional violations always "affect substantial rights," while others may not; and, second, constitutional violations are always prejudicial unless the State proves they are harmless beyond a reasonable doubt, while other errors are only prejudicial if the defendant proves that the error appreciably affected the outcome. But constitutional errors must still be obvious in order to constitute plain error,[64] and they must not have been the result of intelligent waiver or a strategic decision.[65]

We reaffirmed the approach outlined in *Burford* in 1974 in *Martin v. State*,[66] in 1979 in *Brown v. State*,[67] and in 1981 in *Dorman v.*

*State*, 519 P.2d 788, 795 (Alaska 1974); *Burford v. State*, 515 P.2d 382, 383 (Alaska 1973).

Our early cases defined plain error in various ways that, while sounding similar, may not have had precisely the same meaning. For example, some of our cases in the 1960s and early 1970s defined plain error as error that is "obviously prejudicial," *see, e.g., Bowker v. State*, 373 P.2d 500, 505 (Alaska 1962), some defined it as error that must be corrected "to effect substantial justice or prevent the denial of fundamental rights," *see, e.g., Goresen v. State*, 432 P.2d 326, 327 (Alaska 1967), and another defined it as error that is both "obvious" and "substantial," *Dimmick v. State*, 449 P.2d 774, 776 (Alaska 1969).

**58.** *Crutchfield v. State*, 627 P.2d 196, 198 (Alaska 1980); *Moreau v. State*, 588 P.2d 275, 280 (Alaska 1978) (quoting *Garroutte v. State*, 508 P.2d 1190, 1191 (Alaska 1973)).

**59.** *Raphael v. State*, 994 P.2d 1004, 1015 (Alaska 2000) (quoting *United States v. Young*, 470 U.S. 1, 16, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985)).

**60.** *See id.* at 1015 ("We have interpreted the phrase 'plain error' to mean an error that is both obvious and substantially prejudicial."); *Brown v. State*, 601 P.2d 221, 226 (Alaska 1979) ("[T]o constitute plain error, an error or defect must be obvious, affect substantial rights, and be obviously prejudicial."); *Gilbert*, 598 P.2d at 92 ("Where the error is not obvious or immediately apparent we should abstain from a full-scale examination

of it, for the basic rule is that failure to object to offered evidence waives the objection.").

**61.** 515 P.2d at 383 (citing *Chapman v. California*, 386 U.S. 18, 23, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)); *see also Sidney v. State*, 571 P.2d 261, 264 (Alaska 1977).

**62.** *Burford*, 515 P.2d at 383.

**63.** *See, e.g., Kristich v. State*, 550 P.2d 796, 801 (Alaska 1976) (citing *Love v. State*, 457 P.2d 622 (Alaska 1969)).

**64.** *See, e.g., Crutchfield v. State*, 627 P.2d 196, 198 (Alaska 1980) ("[T]he requirement ... that the alleged defect be readily apparent ... applies not just to non-constitutional issues but to those of constitutional dimension as well.").

**65.** *See, e.g., Raphael v. State*, 994 P.2d 1004, 1015–16 (Alaska 2000); *Dorman v. State*, 622 P.2d 448, 457–58 (Alaska 1981).

**66.** 517 P.2d 1399, 1402 (Alaska 1974) ("Denial of a constitutional right affects substantial rights. Therefore, plain error will result unless the defect is harmless beyond a reasonable doubt.").

**67.** 601 P.2d 221, 226 (Alaska 1979) ("[W]here the error denies a constitutional right, by defini-

*State.*[68] But in 1983 the court of appeals held in *Van Hatten v. State* that the standard of prejudice for all plain error cases, including those involving constitutional error, was "whether it can be fairly said that the alleged error did not appreciably affect the jury's verdict."[69] To support its holding the court of appeals quoted language from our decision in *Gilbert v. State:*

> [N]ot all constitutional claims require extensive review under the plain error rule. To say that asserted errors of constitutional dimension must all be examined in depth under the plain error rule would circumvent the strong basic policy which requires that, in order to preserve an error for appeal, an objection must have been made in the trial court.[70]

The State, pointing to *Van Hatten,* now suggests that our plain error rulings are inconsistent[71] and urges us to resolve this perceived inconsistency by adopting the U.S. Supreme Court's interpretation of the federal analogue to Alaska Criminal Rule 47(b).[72] We decline to do so for two reasons.

First, the language in *Gilbert* cited by the court of appeals in *Van Hatten* does not pertain to the prejudice standard for constitutional errors. When read in context, it is apparent that in *Gilbert* we were discussing the requirement that plain error be obvious.[73] Immediately prior to the language quoted in *Van Hatten,* we wrote: "Where the error is not obvious or immediately apparent we should abstain from a full-scale examination of it."[74] One of the underlying principles of the plain error doctrine is that the error must have been so obvious that the trial court should have noticed it despite the absence of an objection. *Gilbert* simply explained that this principle applies even when the appellant alleges a constitutional violation.[75]

---

tion a substantial right is affected, and reversal is required unless the error is found to be harmless beyond a reasonable doubt.").

**68.** 622 P.2d at 459 (applying the standard of harmless beyond a reasonable doubt to plain error review of a constitutional error).

**69.** 666 P.2d 1047, 1057 (Alaska App.1983).

**70.** *Id.* at 1056 (quoting *Gilbert v. State,* 598 P.2d 87, 92 (Alaska 1979)).

**71.** In its initial briefing, the State conceded that the appropriate standard was whether the error was harmless beyond a reasonable doubt. After oral argument, the State requested and was permitted supplemental briefing to address potential ambiguity in our case law concerning the plain error standard for constitutional errors.

**72.** Federal plain error review is governed by Federal Rule of Criminal Procedure 52(b). The U.S. Supreme Court held in *United States v. Olano,* 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993), that federal plain error review is governed by a three-part test: (1) there must be error, and the right at issue must not have been intentionally relinquished; (2) the error must be plain, meaning obvious; and (3) the error must affect substantial rights, meaning it must have affected the outcome of the proceeding. *Id.* at 732–35, 113 S.Ct. 1770.

The first and second prongs of the *Olano* test are the same as our first two requirements under Alaska Criminal Rule 47(b). But unlike the *Olano* court, we have interpreted "affect substantial rights" not to mean that the error was prejudi-

cial, but instead to mean that the error pertains to an important right that could affect the fundamental fairness of the proceeding. We have required a showing of prejudice as a separate factor. And, as explained in detail above, when the error is a constitutional violation, it will always affect substantial rights and will be prejudicial unless it was harmless beyond a reasonable doubt.

**73.** *See Crutchfield v. State,* 627 P.2d 196, 198 (Alaska 1980) (citing *Gilbert* for the proposition that alleged constitutional errors must be "readily apparent" to constitute plain error).

**74.** *Gilbert,* 598 P.2d at 92.

**75.** The State also argues that our decision in *Brown v. State,* 601 P.2d 221 (Alaska 1979), is inconsistent with *Burford.* The State points to language from *Brown* that says: "[W]e have never held that the standard of harmless beyond a reasonable doubt applies merely because a constitutional right is *involved.*" *Id.* at 226 (emphasis added). But the State takes this language out of context. In *Brown,* we concluded that there was no constitutional violation. *Id.* The passage quoted by the State was simply making the obvious point that the alleged constitutional violation must actually have occurred in order to trigger the corresponding harmless error standard. Only a few lines earlier, *Brown* actually reaffirmed our holding in *Burford:* "[W]here the error *denies* a constitutional right, by definition a substantial right is affected, and reversal is required unless the error is found to be harmless beyond a reasonable doubt." *Id.* (emphasis added).

Second, although we did not expressly refer to *Van Hatten,* our recent decision in *Raphael v. State* reaffirmed our pre–*Van Hatten* case law. Quoting *Burford,* we held in *Raphael* that "denial of a defendant's constitutional rights, 'in the normal case, would ... give rise to plain error' "[76] unless "the constitutional error was harmless beyond a reasonable doubt."[77] Our decisions, starting with *Burford* and on through *Raphael,* are consistent on this point. The plain error standard announced in *Van Hatten* is not controlling. Establishing plain error under Criminal Rule 47(b) requires the following: (1) there must be error, and the error must not have been the result of an intelligent waiver or a tactical decision not to object; (2) the error must be obvious, meaning that it should have been apparent to any competent judge or lawyer; (3) the error must affect substantial rights, meaning that it must pertain to the fundamental fairness of the proceeding; and (4) the error must be prejudicial. A constitutional violation will always affect substantial rights and will be prejudicial unless the State proves that it was harmless beyond a reasonable doubt. An error that is not constitutional in nature will be prejudicial if the defendant proves that there is a reasonable probability that it affected the outcome of the proceeding.

## 2. The prosecutor's remarks in this case amounted to plain error.

Applying these standards to the present case, we conclude that there was plain error. First, there is no evidence that Adams's failure to object was strategic. In *Dorman v. State,* we explained that where a defendant "neither injected the issue of his silence into the case nor obtained a benefit from the prosecutor's inculpatory comment,"

there is no basis for inferring that the failure to object was tactical "unless it is implied that defense counsel invited error for the purpose of obtaining a reversal on appeal."[78] Such a conclusion, we cautioned, "is not one which should be lightly inferred in any case, for it would preclude review of the most fundamental defects under the plain error doctrine."[79]

We have already determined that Adams did not inject the issue of his silence into the case,[80] and Adams did not obtain any discernible benefit from the prosecutor's comments. This case turned chiefly on credibility, and the prosecutor argued that Adams was a less credible witness because he did not talk to the police. The State argues that "Adams cannot ... show that defense counsel did not make a tactical decision to refrain from objecting to the prosecutor's references to Adams'[s] silence" because "[d]efense counsel was well aware that Adams'[s] silence could not be used against Adams ... during the first part of the state's case-in-chief." But the prosecutor's remarks during cross-examination occurred four days after the sidebar discussion about Adams's silence during the State's case-in-chief, and his remarks during closing argument occurred a full month later. Defense counsel's awareness of Adams's rights during the State's case-in-chief is not enough to show that his failure to object later in the trial was tactical.[81]

Second, the error in this case was obvious. The major cases establishing that Alaska law protects a defendant's pre- and post-arrest silence were all decided in the 1980s;[82] Adams was tried in late 2005. Thus, the law protecting Adams's right to silence was well established at the time of his trial and the prosecutor committed an obvious violation of

**76.** *Raphael v. State,* 994 P.2d 1004, 1015 (Alaska 2000) (quoting *Burford v. State,* 515 P.2d 382, 383 (Alaska 1973)).

**77.** *Id.*

**78.** 622 P.2d 448, 458 (Alaska 1981).

**79.** *Id.*

**80.** *See supra* Part IV.B.

**81.** We note that if the trial court observes an obvious error such as the one in this case and believes that defense counsel's failure to object may have been tactical, a best practice might be to inquire outside the presence of the jury about the lack of an objection and offer a curative instruction.

**82.** *Silvernail v. State,* 777 P.2d 1169 (Alaska App. 1989); *Nelson v. State,* 691 P.2d 1056 (Alaska App.1984); *Dorman,* 622 P.2d 448; *Gunnerud v. State,* 611 P.2d 69 (Alaska 1980).

that right by expressly arguing that Adams's silence diminished his credibility.[83]

Third, the prosecutor's comments affected Adams's substantial rights. As explained above, any comment on Adams's post-arrest silence would affect substantial rights because it would violate article I, section 9 of the Alaska Constitution. But those comments that were limited to Adams's pre-arrest silence also affected his substantial rights. As the court of appeals explained in *Silvernail v. State*, whether grounded in the Alaska constitution or the rules of evidence, the prohibition on using evidence of a defendant's silence is motivated by the same concern: "The underlying rationale of the constitutional bar against admitting evidence of a defendant's post-arrest silence is the concern that such evidence is only minimally probative, while possessing a high potential for prejudice to the defendant's case. This is the same basic concern expressed in Alaska Rule of Evidence 403."[84] To put it another way, the introduction of evidence of a defendant's silence, whether pre- or post-arrest, affects substantial rights in precisely the same way—by admitting evidence that has an inherently low probative value but a high potential for unfair prejudice. Admission of such evidence threatens the fairness of the proceeding and therefore affects substantial rights.

Finally, the prosecutor's comments were prejudicial. We conclude that the State has not shown that the prosecutor's improper questions and comment about post-arrest silence were harmless beyond a reasonable doubt. And even if our analysis is limited to the non-constitutional claim that the prosecutor commented on Adams's pre-arrest silence, we conclude that Adams has shown that there is a reasonable probability that the error affected the outcome of the case.

Our decisions in *Dorman* and *Gunnerud* and the court of appeals' decisions in *Van Hatten* and *Silvernail* identify several factors that should be considered when determining whether a prosecutor's comments on a defendant's silence were harmless error. First, of course, is the strength of the State's other evidence. *Gunnerud* and *Silvernail* instruct that comment on a defendant's silence is more likely to be prejudicial if the conviction depended primarily on conflicting witness testimony.[85]

This case hinged primarily on the conflicting testimony of Adams and K.S. The elements of the crime at issue were whether K.S. was unaware of the sexual act and whether Adams knew that she was unaware. Adams testified that K.S. was aware and consented to the sexual act. K.S. testified that after going to see Emma Hawley, the next thing she remembered was waking up with Adams on top of her engaged in intercourse, and that she did not consent. The State's other chief witness was Mae Adams. Some parts of Mae Adams's testimony did contradict Adams's testimony—for instance, Mae testified that K.S. was just lying on the bed with her eyes open, while Adams testified that K.S. was actively participating. But other aspects of Mae's story corroborated Adams's testimony, and Adams attempted to impeach Mae's credibility based on the fact that she accepted a plea bargain on the eve of trial that allowed her to serve minimal jail time and avoid sex offender registration in exchange for her testimony.

Second, in *Dorman* we observed that comments on a defendant's silence are more likely to be prejudicial if they occur, as they did here, during closing argument.[86] In *Dor-*

83. *See supra* Part IV.A–B.

84. *Silvernail,* 777 P.2d at 1174.

85. *Gunnerud,* 611 P.2d at 76 ("In determining whether the error was harmless we note that Gunnerud's conviction depended principally upon Baker's testimony."); *Silvernail,* 777 P.2d at 1178–79 ("The issue of Silvernail's guilt rested heavily on the jury's evaluation of the relative credibility of the conflicting testimony.... We are therefore unable to conclude that the errone-

ous admission of the disputed evidence did not appreciably affect the jury's verdict.").

86. *Dorman,* 622 P.2d at 458–59; *accord Van Hatten v. State,* 666 P.2d 1047, 1056 (Alaska App.1983) (explaining that "the possibility of any prejudicial impact flowing from the improper testimony concerning Van Hatten's decision to remain silent" was significantly diminished in part because "[a]t no point in his final argument did the prosecutor mention this evidence").

*man,* we noted that plain error review of such comments was appropriate in part because of our "doubts concerning the effectiveness of an objection made during final argument." [87] We explained:

> A timely objection could have prevented the evidence from ever reaching the jury. However, an objection during final argument is not so effective. The prejudicial comment is before the jury before the objection can be made, and the curative effect of an admonition of the court to disregard the comment is of debatable value.[88]

The court of appeals in *Van Hatten* also recognized that comments on a defendant's silence are more likely to be prejudicial if the comment was "express" rather than a "brief and passing" reference and if the evidence was "directly elicited by the prosecutor's questioning." [89] All of these circumstances are present here; the prosecutor first directly elicited evidence of Adams's silence on cross-examination, and then he expressly commented on that silence during his closing argument. We conclude that Adams has shown that there is a reasonable probability that the prosecutor's comments on pre-arrest silence affected the jury's verdict and that the State has not shown that the comments on post-arrest silence were harmless beyond a reasonable doubt. Thus there was plain error as to the comments on both pre-arrest and post-arrest silence.

## V. CONCLUSION

Because the prosecutor's comments on Adams's invocation of his right to silence amounted to plain error, we REVERSE the court of appeals and REVERSE Adams's conviction.

---

**87.** *Dorman,* 622 P.2d at 458.

**88.** *Id.* (quoting *Padgett v. State,* 590 P.2d 432, 435 (Alaska 1979)).

**89.** *Van Hatten,* 666 P.2d at 1056.

228 Ariz. 1

Steven McCURRY, Petitioner,

v.

The INDUSTRIAL COMMISSION
OF ARIZONA, Respondent,

ADP. TotalSource 1, Inc.,/M21/Act
Management, Respondent
Employer,

Specialty Risk Services, Respondent
Carrier.

No. 1 CA–IC 10–0048.

Court of Appeals of Arizona,
Division 1, Department E.

July 7, 2011.

**Background:** Workers' compensation
claimant sought benefits. The Industrial
Commission, ICA Claim No. 20091–760379,
Carrier Claim No. YLL91512C, Joseph L.
Moore, Administrative Law Judge (ALJ),
determined the claim was noncompensable.
Claimant appealed.

**Holding:** The Court of Appeals, Portley,
J., held that The Commission did not lose
jurisdiction over workers' compensation
case when the ALJ issued its decision
more than 30 days after the matter was
submitted for determination.

Affirmed.

**Workers' Compensation** ⬦1773

The Industrial Commission did not lose
jurisdiction over workers' compensation case
when the administrative law judge (ALJ)
issued its decision more than 30 days after
the matter was submitted for determination;
statute, which provided that an ALJ would
issue a decision within 30 days, was not
jurisdictional. A.R.S. § 23–942(A).

───────────

Barton L. Baker, Attorney at Law by Bar-
ton L. Baker, Yuma, Attorney for Petitioner.

Andrew Wade, Chief Counsel, The Indus-
trial Commission of Arizona, Phoenix, Attor-
ney for Respondent.

Doherty & Venezia, P.C. by Julie A. Do-
herty, Phoenix, Attorneys for Respondents
Employer and Carrier.

OPINION

PORTLEY, Judge.

¶ 1  After his injury, Stephen McCurry
filed a workers' compensation claim. The
Industrial Commission of Arizona ("ICA")
subsequently determined that his claim was
noncompensable. He appeals, and, in our
special action review, we are asked to decide
whether the statutory requirement that an
Administrative Law Judge ("ALJ") issue a
decision within thirty days after a hearing is
mandatory and jurisdictional.[1] Because the
thirty-day provision in Arizona Revised Stat-
utes ("A.R.S.") section 23–942(A) (1995) is
not jurisdictional, we affirm the Award and
Decision Upon Review for a noncompensable
claim.

DISCUSSION

¶ 2  McCurry asserts that the Award must
be set aside because the decision was issued
past the thirty-day period set forth in A.R.S.
§ 23–942(A).[2] Because the issue raises a
question of statutory interpretation, our re-
view is de novo. *Self v. Indus. Comm'n,* 192
Ariz. 399, 400, 966 P.2d 1003, 1004 (App.
1998).

¶ 3  Section 23–942(A) provides that "[u]pon
the conclusion of any hearing, or prior there-
to with concurrence of the parties, the ad-
ministrative law judge *shall promptly and
not later than thirty days after the matter is
submitted for decision determine the matter
and make an award* in accordance with his
determination." (Emphasis added.) Al-
though the plain language of § 23–942(A)
appears to impose a mandatory thirty-day
time limit, in *Shockey v. Industrial Commis-
sion,* we considered an analogous statute,

───────────

1. We address the remaining issue raised on ap-
peal in a separate memorandum decision. *See*
ARCAP 28(g).

2. The hearing ended on March 10, 2010, and the
decision was issued on May 21, 2010.

A.R.S. § 23–943(F) (1995),[3] and held that a statutory requirement to issue a decision in sixty days was "directive and not mandatory." 140 Ariz. 113, 117, 680 P.2d 823, 827 (App.1983).

¶ 4 There, the Decision on Review was issued sixty-seven days after the request, and Shockey argued that the decision was void because it was untimely pursuant § 23–943(G). 140 Ariz. at 116, 680 P.2d at 826. In deciding that the sixty-day requirement was only directive, we relied on *Williams v. Williams*, 29 Ariz. 538, 243 P. 402 (1926), where our supreme court considered whether the sixty-day time limit imposed on superior court judges by Article 6, Section 15, of the Arizona Constitution,[4] was jurisdictional. The court held that the constitutional provision was not jurisdictional and stated:

> If the judgment, when rendered, is to be declared void, then the litigants, who have already been subjected to an unconstitutional delay must again be subjected to the additional delays necessary to again bring the cause to the condition it was before the court violated its sworn duty. They must also pay the accruing costs necessary for that purpose. Were the delay something within the control of the litigant, were it caused by his own dereliction, the conclusion contended for might be tolerated. But the litigant cannot control the action of the court after he has submitted his cause for its decision. To punish the litigant for the wrongs of the court which he has no power to prevent, is not, we repeat, the purpose of this constitutional provision, and to so hold would be subversive of its intent.

*Williams*, 29 Ariz. at 543, 243 P. at 403 (quoting *Demaris v. Barker*, 33 Wash. 200, 74 P. 362, 363 (1903)). We found that the same concerns expressed in *Williams* applied to workers' compensation case decisions. *Shockey*, 140 Ariz. at 117, 680 P.2d at 827.

¶ 5 McCurry, however, contends that the *Shockey* court erred by analogizing the time limits in workers' compensation statutes, which govern ALJs, to constitutional time limits, which govern superior court judges. Specifically, he contends that ALJs, unlike superior court judges, have no inherent authority.

¶ 6 McCurry's argument is unpersuasive. First, *Shockey*, like *Williams*, has stood the test of time. Second, neither case discussed the inherent authority of judges. Instead, both cases discussed the fact that the statutory time periods were not intended to extend litigation when the judge issued an untimely ruling—a situation neither party could prevent. *Williams*, 29 Ariz. at 542–43, 243 P. at 403 (quoting *Demaris*, 74 P. at 363); *Shockey*, 140 Ariz. at 117, 680 P.2d at 827. While McCurry cites various cases holding that administrative agencies lose jurisdiction by acting outside the scope of their governing statutes, his argument presupposes that § 23–942(A) imposes a mandatory time limit, which it does not.

¶ 7 Our analysis finds support in decisions from other jurisdictions which have held that similar statutory time periods are not jurisdictional. *See, e.g., Scottie–Craft Boat Corp. v. Smith*, 336 So.2d 1150, 1151 (Fla.1976) ("We cannot agree with the Industrial Relations Commission that the subject statutory provision ... is mandatory and divests the Judge of Industrial Claims of jurisdiction."); *Bentley v. Aero Energy, Inc.*, 903 S.W.2d 912, 914 (Ky.Ct.App.1995) ("Obviously, the purpose of the time limit is to speed resolution of compensation cases for the benefit of all parties, not to give claimants an additional bite at the apple should the ALJ's decision prove unsatisfactory."); *In re Martino*, 138 N.H. 612, 644 A.2d 546, 548 (1994) ("The statute's purpose of speeding dispositions would be frustrated were we to interpret the

---

3. Section 23–943(F) provides, in relevant part, that "[a] decision upon review shall be made within sixty days after the review has been requested, with preference being given to those cases not receiving compensation." We cite to the current version of the statute because the relevant portion has not been changed since *Shockey*.

4. Article 6, Section 15, previously provided that "[e]very matter submitted to a judge of the superior court for his decision shall be decided within sixty days from the date of submission thereof." Nearly thirty-five years after *Williams*, the constitutional provision was repealed and replaced by Article 6, Section 21, of the Arizona Constitution.

time limitation as a jurisdictional requirement."); *but see Schreck v. City of Stamford*, 72 Conn.App. 497, 805 A.2d 776, 778 (2002).

¶ 8 In *Coleman v. United Parcel Service*, 155 Vt. 646, 582 A.2d 151 (1990), the Vermont Supreme Court considered whether a statutory sixty-day requirement was mandatory. The statute provided that "[w]ithin sixty days [of hearing], the commissioner shall make his award setting forth his findings of fact and the law applicable thereto and shall forthwith send to each of the parties a copy of such award." Vt. Stat. Ann. tit. 21, § 664 (1990). The court refused to vacate an award issued more than sixty days after the hearing and stated:

> A statutory time period is not mandatory unless it both expressly requires an agency or public official to act within a particular time period and specifies a consequence for failure to comply with the provision. Moreover, compliance with the time limit is never considered essential to the validity of the proceeding, unless such is the expressed or evident intention of the Legislature.

*Coleman*, 582 A.2d at 152.

¶ 9 Like the Vermont statute construed in *Coleman*, § 23–942(A) only imposes a time limit and does not impose a consequence for untimely decisions. In other circumstances, our legislature has provided a remedy or consequence when administrative agencies have failed to act within a statutorily imposed time period. *See* A.R.S. § 5–104(D) (Supp. 2010) (providing that a decision of an ALJ becomes the decision of the director of the department unless rejected or modified by the director within thirty days); A.R.S. § 32–2183(K) (Supp.2010) (providing that a denial of a public report will be rescinded and a public report issued if the department does not comply with statutorily imposed timelines); A.R.S. § 40–370(D) (2001) (providing that a utility's request for a surcharge is deemed effective if the commission fails to issue a decision within 120 days). It was well within the legislature's authority to impose a remedy or consequence for untimely decisions in workers' compensation cases. It did not provide a statutory remedy or consequence, and we decline to do so here. Con-

sequently, because § 23–942(A) is directory, rather than mandatory and jurisdictional, the ICA did not lose jurisdiction when the ALJ took more than thirty days to render the decision.

## CONCLUSION

¶ 10 For the foregoing reasons, we affirm the Award.

CONCURRING: LAWRENCE F. WINTHROP and SHELDON H. WEISBERG, Judges.