NOTICE

*The text of this opinion can be corrected before the opinion is published in the* *Pacific* *Reporter.* *Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.us*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

|  |  |
|---|---|
| VIRGINIA MAE STAMPER and JESSE ROBERT BEEBE, | Court of Appeals Nos. A-11820 & A-11821 Trial Court Nos. 3PA-13-067 CR & 3PA-13-053 CR |
| Appellants, |  |
| v. | O P I N I O N |
| STATE OF ALASKA, |  |
| Appellee. | No. 2567 — September 8, 2017 |

Appeals from the Superior Court, Third Judicial District, Palmer, Eric Smith, Judge.

Appearances: Barbara Dunham, Assistant Public Advocate, and Richard Allen, Public Advocate, Anchorage, for Appellant Virginia Mae Stamper. Paul Malin, under contract with the Public Defender Agency, and Quinlan Steiner, Public Defender, Anchorage, for Appellant Jesse Robert Beebe. Timothy W. Terrell (the Stamper appeal) and Terisia K. Chleborad (the Beebe appeal), Assistant Attorneys General, Office of Criminal Appeals, Anchorage, and Craig W. Richards, Attorney General, Juneau, for the Appellee.

Before: Mannheimer, Chief Judge, Allard, Judge, and Suddock, Superior Court Judge. [*]

Judge MANNHEIMER.

---

[*] Sitting by assignment made pursuant to Article IV, Section 16 of the Alaska Constitution and Administrative Rule 24(d).

Virginia Mae Stamper and her husband Jesse Robert Beebe were convicted of crimes arising from Stamper's theft of merchandise from a grocery store in Big Lake. Stamper, who took the merchandise from the store, was convicted of second-degree theft (theft of property valued at $500 or more). [1] Beebe, who was waiting for Stamper in a van in the parking lot, was convicted of third-degree assault for using the van to strike a customer who tried to stop Stamper and Beebe from leaving the parking lot. [2] (According to the testimony at trial, Beebe's van struck the citizen in his mid-section, knocking him backwards about five feet.)

Many of Stamper's and Beebe's actions were recorded by the grocery store's security cameras. When State Trooper Lane Wraith arrived at the store to investigate the theft and assault, he watched portions of the digital security footage — including footage of what happened in the parking lot, as well as footage of Stamper inside the store, putting merchandise into her shopping cart.

Trooper Wraith asked one of the grocery store's loss-prevention employees, Michael Gozdor, to help him make a copy of the digital security footage, but neither Gozdor nor Wraith could figure out how to make a copy of the footage. Before Wraith left the store, he asked Gozdor to try again later to make a copy of the portions of the security footage showing Stamper's and Beebe's actions.

Wraith contacted Stamper and Beebe the next day. After Wraith informed Stamper that there was video footage of her actions, Stamper confessed to the theft. However, even though Wraith told Beebe that there was video footage of Beebe's

___

[1]   Former AS 11.46.130(a)(1) (2013 version).

[2]   AS 11.41.220(a)(1)(A).

collision with the customer in the parking lot, Beebe insisted that he had not struck the customer.

In the meantime, Gozdor managed to transfer some of the store's digital video footage onto a thumb drive. He delivered this thumb drive to Trooper Wraith a day or two after the incident.

Gozdor thought that he had successfully copied all of the relevant security footage. But it turned out that Gozdor only copied the footage of *some* of Stamper's actions inside the store. Moreover, Gozdor failed to copy the footage of Stamper's and Beebe's actions in the parking lot, and he also accidentally included video footage that had nothing to do with Stamper and Beebe's case.

After Wraith received the thumb drive from Gozdor, he plugged it into his computer. He could see that it contained video files, but when Wraith tried to play these video files on his computer, he discovered that his computer did not have the necessary software to open and view the files. Wraith then tried to view the files on a different computer, but he was again unsuccessful. At that point, Wraith simply logged the thumb drive into evidence. Apparently, no one looked at these video files again until the first day of Stamper and Beebe's trial.

The computer that was used at Stamper and Beebe's trial had the necessary software to open and view the video files from the grocery store's security system. But during the trial, when Wraith and Gozdor viewed the video files on the thumb drive, they realized that these files did not include the footage from the parking lot, nor did the files include footage of Stamper's actions in aisle 10 of the store — the aisle from which she had taken most of the stolen merchandise.

By this time, the original security footage was no longer available, because the store's security computer recycled its video files after six months.

After the State concluded its evidence, and after Stamper and Beebe rested without presenting a case, both defense attorneys asked the trial judge to give the jurors a *Thorne* instruction regarding the missing video files — that is, an instruction directing the jurors to assume that the missing video footage would have been exculpatory for both Stamper and Beebe. [3]

The trial judge rejected this request. The judge concluded that the evidence failed to show that the troopers had ever received the missing video files — *i.e.*, failed to show that the missing video files had ever been on the thumb drive that Gozdor delivered to Trooper Wraith. Thus, the judge concluded, the evidence did not show that the troopers had lost or inadvertently destroyed this evidence.

Beebe's attorney argued that this did not make any difference. He asserted that when Wraith asked Gozdor to make a copy of the relevant security footage, Wraith made Gozdor an "agent" of the State Troopers for purposes of preserving this evidence. Thus, the defense attorney argued, when Gozdor failed to successfully copy all of the security footage onto the thumb drive, and when Gozdor allowed six months to elapse (so that the grocery store's security computer re-used that hard drive space), Gozdor's actions amounted to a loss or inadvertent destruction of evidence that should be attributed to the State.

The trial judge rejected this "agency" argument.

The jury found Stamper guilty of theft, and Beebe guilty of assault. Both defendants now appeal, arguing that the State was at fault for losing the video footage, and that the trial judge should have granted their request for a *Thorne* instruction.

---

[3]   *See Thorne v. Dept. of Public Safety*, 774 P.2d 1326 (Alaska 1989).

*The defendants bore the burden of proving that the troopers took possession of the video evidence*

As we explained in the preceding section of this opinion, the trial judge found (after hearing the evidence pertaining to the security video footage) that the defendants had failed to establish that the troopers ever took possession of the missing footage.

On appeal, Stamper and Beebe argue that the judge was wrong to make them bear the burden of establishing that the troopers ever possessed the missing video evidence. Stamper and Beebe contend that the language of the *Thorne* decision makes it clear that the State bears the burden of proving that missing evidence was not lost or destroyed through state action.

As a preliminary matter, there is no reason to think that the burden of proof made any difference to the trial judge's decision.

The trial judge employed the "preponderance of the evidence" standard of proof when he decided the factual question of whether Trooper Wraith ever had possession of the missing video footage. Stamper and Beebe do not argue that this was the wrong standard of proof.

Because the proper *standard* of proof was "preponderance of the evidence", the question of which party bore the *burden* of proof would only make a difference if the evidence was so evenly balanced that the judge could not say what conclusion the preponderance of the evidence favored. (In such a case, the judge would have to rule against whichever party bore the burden of proof.) But here, the trial judge's remarks show that he did not consider this question to be close: there was essentially no evidence that Trooper Wraith ever had possession of the missing video footage.

That being said, we disagree with Stamper and Beebe's contention that the State bore the burden of proof on this issue.

We agree that, had the evidence shown that government agents took possession of the video files, and that these files were now missing, the State would have borne the burden of explaining what happened to the missing files. But in Stamper and Beebe's case, the question was whether the evidence was ever in the government's possession. Because the government's duty to preserve evidence is triggered only when government agents take possession of the evidence, [4] it is the defendant's burden to show (by a preponderance of the evidence) that this triggering event occurred.

This corresponds to the rule that when a defendant claims that the government obtained evidence through an unlawful warrantless search or seizure, it is the defendant's burden to show that a warrantless search or seizure *occurred*, and then it is the government's burden to establish a justification for the warrantless search or seizure. [5]

Thus, the trial judge correctly allocated the burden of proof on the factual question of whether Trooper Wraith ever possessed the security video footage. And the evidence fully supports the judge's finding that Trooper Wraith never had possession of this video footage.

We now turn to the question of whether Michael Gozdor, the grocery store employee, was an agent of the State for this purpose.

---

[4] *See Snyder v. State*, 879 P.2d 1025, 1028 (Alaska App. 1996) (explaining that the government's duty to preserve evidence applies only to evidence that has already been gathered).

[5] *See Willie v. State*, 829 P.2d 310, 312 (Alaska App. 1992): "Once the defendant establishes that a search or a seizure has been conducted by the government without a warrant, it is the government's burden to justify the intrusion."

*Why we reject the defendants' argument that the grocery store's loss-prevention employee became an agent of the State Troopers, and that the troopers therefore had "constructive possession" of the video files*

Stamper and Beebe raise an alternative argument — the contention that even if Trooper Wraith never had possession of the security video files, Wraith nevertheless made Michael Gozdor (the grocery store's loss-prevention employee) an agent of the State Troopers when Wraith asked Gozdor to make copies of the relevant security video footage.

Stamper and Beebe contend that the State should be held responsible for the fact that Gozdor somehow failed to make copies of the pertinent security footage, or that he somehow failed to correctly transfer those video files to the thumb drive that he later furnished to Trooper Wraith, before the grocery store's security system computer over-wrote the pertinent security footage.

We rejected an analogous argument in *Carter v. State*, 356 P.3d 299 (Alaska App. 2015).

The defendant in *Carter* was convicted of theft for stealing money from a wallet during an Easter service at the Tudor Rescue Mission in Anchorage. Carter's actions were recorded by the Rescue Mission's video security system, and several people who had viewed this video footage later testified at Carter's trial. But the video itself was not available at trial because the portion of the hard drive containing the relevant footage was automatically recorded over by the security system after a number of weeks. [6]

The officer who investigated Carter's case testified that he went to the Mission and asked the staff to make him a copy of the security video footage, but he was

---

[6] *Carter*, 356 P.3d at 300.

told that the one person who knew how to do this was not available. The officer repeatedly returned to the Mission to try to get a copy of the video, but he was never successful. Ultimately, it became too late: the security system over-wrote the video footage. [7]

On appeal, Carter argued that the police had a duty to collect the video footage and preserve it — and that, because the police failed to do so, the trial judge should have instructed the jurors under *Thorne* that they should presume that the video would have been exculpatory. [8] We rejected this argument:

> There is some authority for the assertion that the police have an affirmative duty to collect and preserve evidence that they know is important. *See Klumb v. State*, 712 P.2d 909, 912 (Alaska App. 1986). But we conclude that this duty does not apply to cases like Carter's — cases where the evidence is in the hands of a third party, where the defendant knows that the evidence exists (and understands the importance of it), where the evidence is not ephemeral (*i.e.*, its probative value will not be impaired by a short delay in collecting it), and where the defendant has essentially the same opportunity as the government to subpoena or otherwise obtain the evidence.

*Carter*, 356 P.3d at 301.

See also *Bradley v. State*, 662 P.2d 993, 994-95 (Alaska App. 1983), and *Moberg v. Anchorage*, 152 P.3d 1170, 1173-74 (Alaska App. 2007), where this Court held that the government had no duty to preserve blood samples taken by hospital personnel for medical purposes (samples that were later destroyed after the expiration

---

[7] *Ibid.*

[8] *Ibid.*

of the retention period set by hospital procedures) when those samples would have been equally available to the defense if a timely request had been made.

When Trooper Wraith interviewed Stamper and Beebe on the day after the theft, he told both of them that the grocery store had security video footage of their actions. Wraith also told them that he had viewed this video footage, and that it supported the accusations of theft and assault.

Thus, as was true in *Carter*, Stamper and Beebe knew that the security video footage existed, they understood the importance of it, and they knew that this evidence was in the hands of a third party (*i.e.*, the grocery store). Given these circumstances, Stamper and Beebe had essentially the same opportunity as the government to subpoena or otherwise obtain this evidence (because it remained on the grocery store's security system hard drive for six months).

Stamper and Beebe attempt to analogize their case to the situation presented in *State v. Ward*,[9] where this Court approved sanctions against the State when a hospital failed to preserve the defendant's blood sample. But *Ward* presented a significantly different factual situation: the police in *Ward* affirmatively told the defendant that he faced no time limit should he decide to seek preservation and testing of the blood sample. We held that, having made such a guarantee to Ward, the police were required to take steps to ensure that Ward's blood sample remained available to him as they had promised.[10]

But here, Trooper Wraith did not tell Stamper and Beebe that he had collected the security video footage, nor did he assure Stamper and Beebe that this

---

[9]    17 P.3d 87, 88-89 (Alaska App. 2001).

[10]    *Ward*, 17 P.3d at 89.

footage would remain available indefinitely. We therefore conclude that Stamper and Beebe's situation is analogous to the facts of *Carter* rather than the facts of *Ward*.

We also reject Stamper and Beebe's argument that Gozdor should be viewed as the "agent" of the State Troopers, and that Gozdor's handling of the security video footage should be viewed as tantamount to a loss or inadvertent destruction of evidence by the State. The fact that Trooper Wraith asked Gozdor, an employee of the grocery store, to make him a copy of the store's security camera footage did not turn Gozdor into an agent of the State Troopers in the sense that Gozdor now owed a duty to Stamper and Beebe to preserve the video footage, as if he were a police evidence custodian.

In sum, the trial judge properly rejected Stamper and Beebe's request for a *Thorne* instruction.

*Beebe's contention that the absence of the video deprived him of his rights under the confrontation clause*

Beebe raises the separate argument that his right of confrontation was violated by the lack of video footage recording his actions in the parking lot.

As we have explained, the parking lot footage was not available at the time of Beebe's trial, so that footage was not introduced into evidence against Beebe. Thus, to prevail in his confrontation clause argument, Beebe must show that the witnesses against him based their testimony on the unavailable video footage. *See Catlett v. State*, 585 P.2d 553, 557 (Alaska 1978).

The State presented three witnesses to support its assault charge against Beebe. Two of these witnesses personally witnessed the event: Glen Butts, who was an employee of the grocery store, and John Otcheck, the customer who was struck by

Beebe's vehicle when he tried to stop Beebe from leaving the parking lot. There is no indication in the record that either Butts or Otcheck reviewed video footage of this incident.

The State's third witness was Trooper Wraith, who investigated the incident after it was over. During Wraith's testimony, the prosecutor played an audio recording of Wraith's interview with Beebe. During Wraith's interview with Beebe, Wraith made assertions about the content of the video footage. In particular, Wraith told Beebe that there was video footage of what happened in the grocery store parking lot — and that this video showed Beebe driving toward "the guy standing in front of [his] car" (*i.e.,* Otcheck).

When the prosecutor played the audio of this interview, Beebe's attorney did not object. Accordingly, Beebe must now show that the playing of the audio was plain error.

To establish plain error, Beebe must show that there is at least a reasonable possibility that the references to the unavailable security footage prejudiced him — *i.e.,* a reasonable possibility that these references affected the jury's decision in a manner adverse to Beebe.[11] For two reasons, we conclude that there was no prejudice.

First, when Wraith told Beebe that there was video footage showing that Beebe drove his car toward Otcheck, Beebe immediately responded that this was not true — and he urged Trooper Wraith to re-examine the video. Beebe's precise words were, "No. ... No. I pulled away just a little bit, nice and easy, if you look at that video. Look at the video." Later in the same interview, when Wraith again accused Beebe of driving toward Otcheck and hitting him with his car, Beebe responded, "I didn't drive towards

---

[11] *Adams v. State*, 261 P.3d 758, 773 (Alaska 2011).

him. You've got to look at that [video] carefully. ... He was leaning [and] he moved away gently."

Second, after the audio recording of the interview was played for the jury, Trooper Wraith was cross-examined by both Stamper's and Beebe's defense attorneys. During this cross-examination, Wraith conceded that he had misrepresented the content of the video to Beebe — that the video did not actually show Beebe hitting Otcheck with his car.

Specifically, during cross-examination by Stamper's attorney, Wraith was asked, "Did you actually observe any of what occurred in the parking lot [with] the vehicle involving Mr. Otcheck when you watched the video?" This question led to the following colloquy:

> *Wraith*: I think there was some footage of the parking lot that you could see in one of the videos. ... It was far out there in the video, and [it was] difficult to discern exactly what was happening, and who was where.
>
> *Stamper's attorney*: Okay. And I want to be clear, ... are those observations you made here in court, or are those observations you made when you looked at the store video?
>
> *Wraith*: When I observed the [store] video.
>     . . .
> *Stamper's attorney*: Okay. And [in your interview with Mr. Beebe], you described a scenario to Mr. Beebe ... wherein you said that he drove forward [toward Otcheck]. Did you, in fact, see that whole incident on the video?
>
> *Wraith*: I did. But like I said, it was hard to see who was who. I could [see] the van moving. I could see people around it. But I — it was — it's too far out in the video to really see clearly what had happened in it.

> *Stamper's attorney*:  Okay. Could you actually make out if Mr. Otcheck was struck by the vehicle?

> *Wraith*:  I was unable to determine for sure by the video.

A few minutes later, when Trooper Wraith was cross-examined by Beebe's defense attorney, Wraith reiterated that the video was inconclusive:

> *Wraith*:  As far as the footage in the parking lot was concerned ... , as I explained to your colleague [*i.e.*, Stamper's defense attorney], [in] the footage out in that parking lot, ... [Beebe's] vehicle was barely discernible in the video at all, and you could not see what was going on right around the vehicle, other than people around it.  So ... I was unable to discern what was there[.]

Based on this record, we conclude that there is no reasonable possibility that Beebe was prejudiced by the references to the unavailable video footage.  We therefore reject Beebe's claim of plain error.

*Conclusion*

The judgement of the superior court is AFFIRMED.